DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Patricia Brooks, appeals her conviction and sentence out of the Wadsworth Municipal Court. This Court affirms.
 I. {¶ 2} On May 29, 2007, Brooks was indicted on 20 counts of cruelty to animals, in violation of R.C. 959.13(A)(1) and/or (2), misdemeanors of the second degree. At that time, Brooks owned a 17.6-acre property in Lodi, Ohio where she kept approximately 45 horses. Brooks pled not guilty to the charges. Brooks' case proceeded to trial. At the conclusion of trial, the jury found Brooks guilty on all counts. On October 9, 2007, the trial court sentenced Brooks on all three cases. In the first case, the trial court sentenced Brooks to a jail term of 90 days with 30 days suspended, for a total of 60 days in jail and five years of probation. In the second case, the trial court sentenced Brooks to 90 days in jail with all 90 days suspended and five years of probation. In the third case, the trial court sentenced Brooks to 90 days in jail with all 90 days *Page 2 
suspended and five years of probation. In addition, as a condition of her probation, the trial court ordered forfeiture of all of Brooks' animals, including her horses and all her dogs and cats. With the exception of the forfeiture of the horses, Brooks' sentences were stayed pending the outcome of her appeal. Brooks timely appealed, raising four assignments of error for our review.
 II. ASSIGNMENT OF ERROR I "DEFENDANT-APPELLANT'S CONVICTIONS ON ALL TWENTY COUNTS OF MISDEMEANOR CRUELTY TO ANIMALS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 3} In her first assignment of error, Brooks asserts that all of her convictions for cruelty to animals were against the manifest weight of the evidence. This Court disagrees.
 "In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. Id.
 {¶ 4} Brooks was convicted of cruelty to animals, in violation of R.C. 959.13(A)(1) and/or (2), which state, in pertinent part, that
 "(A) No person shall:
 "(1) Torture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good wholesome food and water;
 "(2) Impound or confine an animal without affording it, during such confinement, access to shelter from wind, rain, snow, or excessive direct sunlight if it can reasonably be expected that the animal would otherwise become sick or in some other way suffer." *Page 3 
 {¶ 5} A violation of R.C. 959.13 "requires proof that the defendant acted with a reckless state of mind." State v. Howell (2000),137 Ohio App.3d 804, 813. Recklessly is defined under R.C. 2901.22(C) as follows:
 "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."
 {¶ 6} Brooks was charged with a total of 20 counts of animal cruelty. Some of the counts concerned only one horse while others concerned one or more or even several specifically identified horses. The charges fell into the following three categories:
(1) Ten counts of recklessly impounding or confining one or more animals without supplying during the confinement a sufficient quantity of good wholesome food and water, in violation of R.C. 959.13(A)(1);
(2) Two counts of recklessly impounding or confining one or more animals without affording, during confinement, access to shelter from excessive direct sunlight if it can be reasonably expected that one or more animals would otherwise become sick or in some other way suffer, in violation of R.C. 959.13(A)(2); and
(3) Eight counts of recklessly torturing or depriving of necessary sustenance one or more animals, in violation of R.C. 959.13(A)(1).
The record reflects that the State presented testimony on each of these three categories.
 {¶ 7} At trial, Humane Society Agent, Penny Blake, testified regarding her interactions with Brooks and her investigation into this matter. Blake testified that she met Brooks in 1995 when Brooks owned a dog kennel in Medina. Blake responded to a call from some neighbors who were concerned about the safety of some dogs at the kennel. Over a ten-month period, Brooks received calls about every six to eight weeks from people who expressed concern about the dogs' care. According to Blake, "[c]omplaints ranged from animals without water, animals without food, animals in filth * * * dogs without water, dogs that were underweight." *Page 4 
 {¶ 8} Blake testified that in response to the calls, she visited Brooks to talk with her about caring for her animals. She offered that the Humane Society could help her find homes for the animals. Blake specifically told Brooks that she felt that some of the animals were suffering unnecessarily because of the filth, inadequate food and inadequate water. Although Brooks made minor improvements after receiving Blake's warnings, she did not make changes significant enough to satisfy Blake.
 {¶ 9} In 2002, Blake responded to a call regarding Brooks' 11 horses. At that time, Blake talked with Brooks about securing the fencing around her horse pasture and providing adequate food and water for the horses. Blake specifically instructed Brooks about the amount of food and water she should be providing to the horses.
 {¶ 10} On April 20, 2007, and again on May 5, 2007, Blake received two complaints from a woman named Carol Smith regarding Brooks' property in Medina. Smith told Blake that she first visited Brooks' property in December of 2006 or January of 2007. At that time, Smith noticed that Brooks' horses were overcrowded and were living in filthy conditions. Smith and her daughter began occasionally helping Brooks with her farm. Smith tried to persuade Brooks to downsize her farm so that she could manage the herd. Smith ultimately reported Brooks' conduct to the humane society after Brooks failed to provide veterinary care for horses that were suffering. Smith provided Blake with photographs of frail horses exhibiting serious neglect. The photographs depicted horses suffering from such ailments as large growths, rain rot and broken hooves.
 {¶ 11} Blake obtained and executed a search warrant of Brooks' property. The Medina County Sheriffs Department assisted Blake with the search. Blake took several photographs of Brooks' property and horses. While there, Brooks informed Blake that she was the owner of all *Page 5 
of the animals on the property and that she and her mother, Janice Donnelly, provided all the care and maintenance of the horses. Brooks denied that any of the horses had been sick. However, when questioned, Brooks admitted that one of the horses had died earlier in the week from colic.
 {¶ 12} Blake testified that she could tell that the horses were severely dehydrated because when they were offered water, they drank ravenously. She said that a horse would normally take a drink from a bucket over a period of five to ten seconds, and then it would walk away. Blake noted that when Brooks' horses were offered water, they drank continuously for a long period of time. She noted that some of them drank three-quarters of a bucket of water at a time. On cross-examination, Blake admitted that she did not know whether Brooks had ordered grain and had not asked her.
 {¶ 13} Dr. Michael Geiger, a veterinarian, also testified at trial. Dr. Geiger stated that he was also present during Blake's search of the property. At that time, Dr. Geiger examined all 46 horses. Dr. Geiger testified that he noticed wide-spread evidence of malnutrition, lack of water, filth and other conditions causing suffering. Dr. Geiger instructed Brooks to remove all but 17 horses from the property. He explained that because the investigators were not prepared to transport all 46 horses at that time, only the 29 horses most critically in need of care were actually transported.
 {¶ 14} At trial, the State asked Dr. Geiger specific questions based on photographs taken of the horses during Dr. Geiger's investigation at Brooks' property. In most cases, the photos were of a particular horse. The State questioned Dr. Geiger regarding the specific ailments of the horse pictured in the photograph. The State then asked Dr. Geiger to compare the photographs of the horses with photographs taken four months after their seizure. Dr. Geiger noted the *Page 6 
significant improvement in the horses' appearances after receiving adequate food and water for four months.
 {¶ 15} Dr. Geiger testified that the horses did not have enough grass to eat. He explained that horse pastures have roughs and lawns. The lawn portion is where the horses graze and the rough portion is where the horses defecate. Because there were no roughs in the pasture, Dr. Geiger deduced that the horses were eating the grass on which they were defecating.
 {¶ 16} Dr. Geiger testified that several of the horses he examined were malnourished. He testified that the ribs of some of the horses were visible. He testified that another horse suffered from a skin disorder and that proper nutrition is a vital part of maintaining a horse's health. Dr. Geiger recognized that at least one of the horses exhibited signs of malnutrition because the horse had not shed its winter hair coat by the end of May, when he conducted his investigation.
 {¶ 17} Dr. Geiger testified regarding his calculation of the amount of grain and hay reasonably needed to provide sufficient food for Brooks' horses from January 1, 2007, through the date of the execution of the search warrant, May 23, 2007. Even though there were 46 horses on the property, Dr. Geiger calculated the grain quantity based on 36 horses to provide a more conservative estimate. Dr. Geiger calculated that the horses needed a minimum of 180 pounds of grain per day. He stated that he only found 150 pounds of grain during the search. Pursuant to his calculations, there was not even enough grain on the premises to feed the horses for one day.
 {¶ 18} Dr. Geiger calculated that 36 horses would need 25 pounds of hay per day, which amounted to 27,000 pounds of hay per month. Pursuant to his calculations, Brooks would have needed 128,250 pounds of hay to sustain the horses from January 1, 2007 through the date of the execution of the search warrant, May 23, 2007. *Page 7 
 {¶ 19} Dr. Geiger further testified that the horses were not provided with adequate water. He explained that it is appropriate for horses to have water available to them at all times. He reported that most of the water buckets contained filthy water, no water, or were both filthy and contained no water.
 {¶ 20} One of the horses was so severely debilitated that it had to be carried out of the stall as it was too weak to walk. Dr. Geiger had to give the horse IV fluids.
 {¶ 21} Carol Smith also testified on behalf of the State. Smith stated that she told Brooks' mother, Janice, that pregnant mares needed to be fed twice a day. Smith testified that on a few occasions, she prompted Brooks to seek a veterinarian's assistance. With regard to one horse who was colicking[1], Smith prompted Brooks to call a veterinarian. Brooks ultimately called a veterinarian but the veterinarian refused to help because Brooks owed him money. The horse died.
 {¶ 22} Joe Seeley, a friend of Brooks who also owns horses, testified on her behalf. Seeley testified that two nights before Blake executed the search warrant, he and Brooks tentatively reached an agreement for his purchase of 11 or 12 of Brooks' horses. He further stated that three weeks before the search warrant was executed, he and Brooks tentatively agreed that he would purchase three other horses. Seeley testified that he was going to give Brooks bails of hay in exchange for the horses so that she would have hay to feed her remaining horses. There was no contract or other document evidencing this agreement.
 {¶ 23} Seeley testified that Brooks generally took excellent care of her horses but that she had recently experienced difficult financial times, which impacted her ability to care for the *Page 8 
horses. Seeley testified that Brooks always had food for the horses but that sometimes her supply would be low. He also admitted that he believed that Brooks had more horses than she could care for and that he had been trying to help her find a solution. He also admitted that when he spoke with Blake on May 24 he told her that some of Brooks' horses were starving. Seeley acknowledged that he told Blake that he had been at Brooks' property burying a yearling that had died and that the yearling had starved to death.
 {¶ 24} Tom Trout, a farmer who sold hay to Brooks, also testified on her behalf. Trout testified that between January and May 2007, Brooks bought hay from him but that he had no specific record as to how much she purchased during this time. On cross-examination, Trout testified that he told Blake that he thought she had more animals than she could handle.
 {¶ 25} Lee English, Brooks' neighbor, also testified on her behalf. English testified that he and his daughter have adjacent properties on which they raise alpacas. He testified that Brooks used his daughter's pasture to rotate her horses off her own pasture so that she did not let her pastures "get all the way eaten down."
 {¶ 26} Eric Robson, a farmer from whom Brooks purchased hay, also testified on her behalf. Robson estimated that from January to May 23 of 2007, he sold Brooks approximately 18 tons of hay.
 {¶ 27} Jessica Jeskovic also testified on behalf of Brooks. Jeskovic testified that she has known Brooks for six years and that the two co-own a horse. She stated that she visited Brooks' property on numerous occasions between January and May of 2007. Jeskovic testified that she often helped Brooks with the horses. She specifically stated that she would clean the stalls and help feed the horses. She testified that every time she was out there, Brooks and her mother were cleaning stalls. Jeskovic testified that both Brooks and her mother cared a great deal for the *Page 9 
horses. She stated that the last time she visited Brooks' property was at the end of February 2007.
Insufficient food and water
 {¶ 28} Both Blake and Dr. Geiger testified that Brooks' horses were severely dehydrated and malnourished. Dr. Geiger testified that the horses did not have enough grass to eat. He also testified that the horses did not have enough grain and hay to eat. Blake agreed with Dr. Geiger's calculation that the horses needed at least 180 pounds of grain per day and that the 150 pounds of grain that Brooks had for the horses was not enough even for one day. Brooks was unable to provide receipts for any hay purchases. In her brief, she alleges that she can account for purchasing 104,000 pounds of hay. Notably, this amount would still be significantly less than the amount necessary to maintain the horses.
 {¶ 29} Dr. Geiger further testified that the horses were not provided with adequate water. He explained that it is appropriate for horses to have water available to them at all times. He reported that most of the water buckets contained filthy water, no water, or were both filthy and contained no water.
Insufficient access to shelter
 {¶ 30} Dr. Geiger also testified that Brooks failed to provide the horses with adequate shelter from the sun. He testified that a few of the horses were suffering from sunburns.
 {¶ 31} Blake testified that the temperature inside the barn was 90 degrees and that the barn had no fans. She further stated that some of the horses still had their winter coats and that these horses in particular were suffering from the heat. *Page 10 
 Reckless torture and/or deprivation of necessary sustenance
 {¶ 32} Dr. Geiger testified that many of the horses were living in filthy conditions. In the horses' stalls, manure had piled up to knee deep level. Dr. Geiger testified that it would have taken months for the manure to pile up to this level. In at least one of the stalls, manure was piled up so high that the stall door would not close. Dr. Geiger explained that the horses' exposure to such large amounts of manure could have caused or contributed to a number of other ailments such as skin irritation, infection and thrush.
 {¶ 33} In addition, Dr. Geiger testified that there was a significant amount of urine in the stalls. He stated that the smell of ammonia from the urine was so overwhelming that the investigators became dizzy and experienced burning sensations in their eyes and noses. The investigators often had to leave the area to escape the fumes. The horses' confinement to this area could cause them to suffer respiratory problems. Dr. Geiger testified that at least a few of the horses he inspected were suffering from respiratory problems as a result of the significant ammonia odor.
 {¶ 34} Dr. Geiger also noted that several of the horses suffered from inadequate dental care. He noted that some of the horses had abscessed teeth and other painful conditions as a result of the inadequate care.
Recklessness
 {¶ 35} The testimony at trial demonstrates that Brooks acted recklessly, i.e. "with heedless indifference to the consequences," and that she "perversely disregarded] a known risk that [her] conduct [was] likely to cause a certain result[.]" Smith, Seeley and Jeskovic all testified that Brooks was knowledgeable about horses. Both Blake and Dr. Geiger testified that *Page 11 
they specifically instructed her about proper care for horses. Blake specifically testified regarding Brooks' knowledge about proper animal care:
 "I have a history with [Brooks] and she is well aware of the proper animal care of horses and dogs. She did not follow what she knows, and education is to learn. And I've had many discussions with her to teach her and for her to learn about how to care for animals.
 "In my opinion, she chose not to do what she knows needed to be done for those horses. So the education and warnings were not sufficient. We needed to bring charges against [Brooks] at that time."
 {¶ 36} In addition, Brooks' friends, Smith, Seeley and Trout, all told Brooks that she had more horses than she could manage. Despite this knowledge, Brooks failed to take action, either by relinquishing horses or by providing more food, water and medical care. Her conduct evidenced clear disregard of a known risk that her conduct was likely to cause certain problems for her horses. Accordingly, the jury's decision, convicting Brooks on 20 counts of animal cruelty, was not against the manifest weight of the evidence. Brooks' first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "DEFENDANT-APPELLANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY FAILING TO OBJECT TO THE PROSECUTION'S INTRODUCTION OF EVIDENCE CONCERNING ALLEGED PRIOR ACTS OF ALLEGED CRUELTY TO ANIMALS TO IMPERMISSIBLY SHOW CONDUCT IN CONFORMITY THEREWITH, AND BY FAILING TO MAKE A CRIM.R. 29 MOTION FOR ACQUITTAL AT THE CLOSE OF ALL EVIDENCE."
 {¶ 37} In her second assignment of error, Brooks argues that her trial counsel was ineffective for failing to object to the State's introduction of evidence concerning her alleged prior acts of cruelty to animals and by failing to make a Crim. R. 29 motion for acquittal at the close of all the evidence. This Court disagrees. *Page 12 
 {¶ 38} To establish the existence of ineffective assistance of counsel, Brooks must satisfy a two-pronged test:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v. Hoehn, 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, at ¶ 43, quoting Strickland v. Washington (1984), 466 U.S. 668, 687.
 {¶ 39} Brooks bears the burden of proving that counsel's assistance was ineffective. Hoehn at ¶ 44, citing State v. Smith (1985),17 Ohio St.3d 98, 100. In this regard, there is a "strong presumption that licensed attorneys are competent and that the challenged action is the product of a sound strategy." State v. Watson (July 30, 1997), 9th Dist. No. 18215. In addition, "debatable trial tactics do not give rise to a claim for ineffective assistance of counsel." Hoehn at ¶ 45, citingState v. Clayton (1980), 62 Ohio St.2d 45, 49. Even if this Court questions trial counsel's strategic decisions, we must defer to his judgment. Clayton, 62 Ohio St.2d at 49. The Ohio Supreme Court has stated:
 "`We deem it misleading to decide an issue of competency by using, as a measuring rod, only those criteria defined as the best of available practices in the defense field.' * * * Counsel chose a strategy that proved ineffective, but the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client." Id., quoting State v. Lytle (1976), 48 Ohio St.2d 391, 396.
Upon review of the record, this Court finds that Brooks has failed to meet the first prong of the test set out in Strickland, 466 U.S. at 687.
 {¶ 40} We will first address Brooks' contention that her counsel was ineffective for failing to object to the State's introduction of testimony by Blake about prior similar acts of *Page 13 
animal cruelty involving both dogs and horses to show Brooks' conformity therewith. Evid. R. 404(B) provides:
 "Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 41} The record reflects that Blake testified that Brooks was knowledgeable about proper care of horses. Blake also testified that Brooks had been investigated and warned about her inadequate care of animals. She specifically testified that she informed Brooks about the proper way to maintain a clean living environment for animals, the importance of providing consistent access to potable water, and the importance of providing sufficient food for animals. This testimony was admissible to prove that Brooks acted recklessly. As we explained herein, to prove that Brooks acted recklessly, the State was required to demonstrate that she "perversely disregarded] a known risk." (Emphasis added.) R.C. 2901.22(C). Blake's testimony demonstrated that she knew about proper animal care and the effect of failing to properly care for animals.
 {¶ 42} Furthermore, Brooks' trial counsel's decision not to object to this testimony was a trial tactic. This Court has consistently held that "trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel."State v. Guenther, 9th Dist. No. 05CA008663, 2006-Ohio-767, at ¶ 74.
 {¶ 43} We similarly find no merit in Brooks' contention that her counsel was ineffective for failing to make a Crim. R. 29 motion for acquittal at the close of all the evidence. With regard to this argument, Brooks asserts that by failing to move for acquittal at the close of all the evidence, her "counsel at trial waived all but plain error in challenging the sufficiency of the *Page 14 
evidence on direct appeal." This is an incorrect statement of the law. In State v. Thornton, 9th Dist. No. 23417, 2007-Ohio-3743, at ¶ 13-14, this Court explained that a criminal defendant's failure to move the trial court for acquittal does not forfeit her opportunity to argue on appeal that her conviction is not supported by sufficient evidence. Accordingly, the failure of Brooks' trial counsel to renew the motion for acquittal pursuant to Crim. R. 29 did not constitute ineffective assistance of counsel.
 {¶ 44} Brooks' arguments do not rise to the level of ineffective assistance of counsel. Brooks' second assignment of error is overruled. ASSIGNMENT OF ERROR III "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING THE PROSECUTION TO INTRODUCE, OVER DEFENSE COUNSEL'S OBJECTIONS, EVIDENCE AND TESTIMONY THAT BOTH DEFENDANT-APPELLANT AND HER MOTHER HAD BEEN PREVIOUSLY CONVICTED OF CRUELTY TO ANIMALS."
 {¶ 45} In her third assignment of error, Brooks asserts that the trial court committed prejudicial error by allowing the State to introduce evidence and testimony that both she and her mother had been previously convicted of cruelty to animals. This Court disagrees.
 {¶ 46} A trial court enjoys broad discretion in the admission of evidence and will not be reversed on appeal absent an abuse of discretion that has materially prejudiced the defendant. State v.Smith (Nov. 8, 2000), 9th Dist. No. 99CA007399. An abuse of discretion is more than error of law or judgment. It implies "perversity of will, passion, prejudice, partiality or moral delinquency." Pons v. Ohio StateMed. Bd. (1993), 66 Ohio St.3d 619, 621. In order for a trial court to abuse its discretion, the result of its determination must be so grossly violative of fact and logic that such result evidences the exercise of passion or bias instead of reason. State v. Jenkins (1984),15 Ohio St.3d 164, 222. *Page 15 
 {¶ 47} The record reflects that Blake testified that Brooks' mom, Jan Donnelly, was convicted of animal cruelty in 1998. With regard to this testimony, Brooks' counsel stated:
 "Your purpose of testifying to that, I am assuming, is to say that Patty Brooks should not have had her mom working with these horses, with Patty Brooks; is that correct?"
 {¶ 48} In response, Blake stated, "My purpose is that it's a statement of fact, is that that happened in 1998." Blake further testified that she thought it was reckless to have someone care for animals who had previously been convicted of animal cruelty.
 {¶ 49} Evid. R. 404(B) limits the use of evidence of a prior conviction to prove "the character of a person in order to show that action in conformity therewith." Donnelly's character was not at issue at trial. Donnelly did not testify, nor was she charged with any crimes. As such, this evidence was clearly not admitted to impeach Donnelly. Rather, this evidence was introduced to show Brooks' mental state, i.e. that Brooks knew about Donnelly's prior conviction but still entrusted her to help care for the horses.
 {¶ 50} With regard to Brooks' prior convictions, the record reflects that on direct, Blake only testified about prior conversations she had with Brooks about properly caring for animals. Blake did not testify on direct about Brooks' prior charges or conviction. However, on cross-examination, Blake was questioned about her prior contacts with Brooks in 1995, 1996 and 2002 and whether she held a "grudge" against Brooks from those encounters. In addition, Blake was asked why she was willing to leave 17 horses in Brooks' care. Brooks' counsel pushed Blake on this issue, asking:
 "Q: My next question then is, so this is the woman that you say back in 1995, 1996, and 2002 wouldn't follow your directions, wouldn't follow your education, and you couldn't educate her before the raid, and — to rephrase my question, this is the same woman, okay? That you are telling me that you had to raid her property because she wouldn't listen, she wouldn't follow your directions, and now you trust her to follow your directions in 2007, correct? *Page 16 
 "A: In `96 she was left with animals, and I don't know if I am permitted to say, but animals — we served a search warrant and charged her with animal cruelty, left fifty-eight dogs in her care and custody after that search warrant. Those dogs were not removed from her property, they were left in her care and control."
Brooks did not object nor move to have this testimony stricken.
 {¶ 51} On redirect, Blake was asked about the outcome of the 1996 case. Blake testified that Brooks was convicted of animal cruelty. The trial court overruled Brooks' objection.
 {¶ 52} We find no error in the admission of this testimony. Brooks clearly opened the door to this testimony on cross-examination when she attempted to bolster her defense that she was being unfairly targeted because the investigators held a grudge.
 {¶ 53} "The introduction of evidence of other bad acts can be prejudicial and is generally prohibited by Evid. R. 404(B)." State v.Moore, 8th Dist. No. 80416, 2003-Ohio-1154, at ¶ 23, citing State v.Curry (1975), 43 Ohio St.2d 66, 68-69. However, courts will not find prejudicial error when the defense "opens the door" to such evidence.Moore at ¶ 23, citing State v. Greer (1988), 39 Ohio St.3d 236, 243;State v. Hartford (1984), 21 Ohio App.3d 29, 31. Accordingly, because the defense opened the door to Blake's testimony, we do not find it constitutes reversible error. See Moore at ¶ 23 (finding that defense opened the door to witness' testimony on redirect that defendant had been convicted of shooting his best friend, when defense asked witness on cross-examination about her hesitation in implicating the defendant).
 {¶ 54} Brooks' third assignment of error is overruled. ASSIGNMENT OF ERROR IV "THE TRIAL COURT ERRED IN VIOLATION OF THE DEFENDANT-APPELLANT'S CONSTITUTIONAL RIGHTS BY ORDERING THE FORFEITURE OF HER DOGS AND CATS, WHERE THERE WAS NO EVIDENCE THAT SAID ANIMALS WERE ABUSED OR NEGLECTED BY ANYONE AND WHERE DEFENDANT-APPELLANT'S CONVICTIONS OF ANIMAL-CRUELTY IN THE INSTANT CASE INVOLVED HORSES ONLY." *Page 17 
 {¶ 55} In her fourth assignment of error, Brooks contends that the trial court erred in violation of her constitutional rights by ordering the forfeiture of her dogs and cats, where there was no evidence that the animals were abused or neglected by anyone and where her convictions for animal cruelty in the within matter involved only horses. This Court disagrees.
 {¶ 56} A trial court has broad discretion in imposing conditions of probation. Lakewood v. Hartman (1999), 86 Ohio St.3d 275, 277. As such, the imposition of these conditions are reviewed under an abuse of discretion standard. State v. Tally, 103 Ohio St.3d 177, 2004-Ohio-4888, at ¶ 10.
 {¶ 57} Pursuant to R.C. 959.99(D),
 "Whoever violates division (A) of section 959.13
of the Revised Code is guilty of a misdemeanor of the second degree. In addition, the court may order the offender to forfeit the animal or livestock and may provide for its disposition, including, but not limited to, the sale of the animal or livestock. If an animal or livestock is forfeited and sold pursuant to this division, the proceeds from the sale first shall be applied to pay the expenses incurred with regard to the care of the animal from the time it was taken from the custody of the former owner. The balance of the proceeds from the sale, if any, shall be paid to the former owner of the animal."
R.C. 959.99(D) classifies a violation of R.C. 959.13 as a second degree misdemeanor. R.C. 2929.22(A) allows a trial court to impose probation for a second degree misdemeanor.
 {¶ 58} The reasonableness of probation conditions must be evaluated using the three-prong test set forth in State v. Jones (1990),49 Ohio St.3d 51, 53. As such, this Court should
 "consider whether the condition (1) is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation." Id.
 {¶ 59} In its sentencing entry, the trial court ordered, as a condition of her probation, forfeiture of all of Brooks' animals including all her horses, dogs and cats. The trial court's chosen condition of probation satisfies the three-prong test set forth inJones. The probationary *Page 18 
condition that Brooks challenges has a relationship to the crime of which she was convicted. Brooks failed to properly care for her horses. More specifically, she failed to provide the horses with proper food and water and adequate access to shelter, and further, she recklessly tortured and/or deprived her horses of necessary sustenance. The probationary conditions directly address this crime by requiring that she forfeit all her horses, dogs and cats and prohibiting her from owning or possessing any animal. The conditions also relate to future criminality by preventing Brooks from being in a position, as owner or possessor of a horse, dog, or cat, where she would be responsible for the animal's health and welfare. Finally, the conditions relate to rehabilitation by impliedly permitting Brooks to own and possess animals once her probation expires.
 {¶ 60} Our sister courts have upheld similar orders to forfeit animals that were not the subject of the defendant's convictions for animal cruelty. See State v. Hale, 7th Dist. No. 04MO14, 2005-Ohio-7080
(finding that revocation of defendant's kennel license and mandated reduction in his collection of dogs was a valid and lawful form of punishment where he was convicted of multiple counts of cruelty to animals under R.C. 959.13(A)(4)); State v. Barker (1998),128 Ohio App.3d 233 (finding that defendant could be required to give up all animals in her possession as a condition of probation and not merely those particular animals with respect to which she had been convicted of cruelty; condition was reasonably related to defendant's rehabilitation, had relationship to defendant's failure to provide animals with adequate air and wholesome exercise, and denied defendant further opportunity to commit cruelty to animals during term of her probation); State v.Sheets (1996), 112 Ohio App.3d 1 (holding that the conditions of probation imposed on defendant, who was convicted of failing to provide sufficient food to ten specified horses in violation of R.C. 959.13, which required that the defendant *Page 19 
surrender all 122 horses seized from his farm and that he not own horses in that county during probationary period, were not abuses of discretion). Therefore, we reject Brooks' assertion that only the 45-46 horses located at her property in Lodi were subject to forfeiture.
 {¶ 61} Accordingly, Brooks' fourth assignment of error is overruled.
 III. {¶ 62} Brooks' assignments of error are overruled. The judgment of the Wadsworth Municipal Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Municipal Court, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
MOORE, J. DICKINSON, J. CONCUR
[1] According to Smith, a colicking horse is a horse who is lying down and cannot get back up. *Page 1