[Cite as *State v. Pryor*, 2024-Ohio-3154.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

KEYOWN D. PRYOR,

    DEFENDANT-APPELLANT.

CASE NO. 1-22-48

O P I N I O N

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

KEYOWN D. PRYOR,

    DEFENDANT-APPELLANT.

CASE NO. 1-22-49

O P I N I O N

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

KEYOWN D. PRYOR,

    DEFENDANT-APPELLANT.

CASE NO. 1-23-46

O P I N I O N

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**

    **v.**

**KEYOWN D. PRYOR,**

    **DEFENDANT-APPELLANT.**

**CASE NO. 1-23-47**

**O P I N I O N**

---

**Appeals from Allen County Common Pleas Court**
**Trial Court Nos. CR 2021 0440 and CR 2022 0009**

**Judgments Affirmed**

**Date of Decision: August 19, 2024**

---

**APPEARANCES:**

    *Brian A. Smith* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Keyown D. Pryor ("Pryor"), appeals the August 11, 2022 judgments of the Allen County Court of Common Pleas sentencing him to prison after being convicted by a jury and the June 13, 2023 judgments denying his motions for a new trial. For the reasons that follow, we affirm.

{¶2} This case arises from two incidents between Pryor and R.H. R.H. is the natural mother of J.P., Pryor's son. The first incident, on November 28, 2021, involved Pryor physically assaulting R.H. as she drove Pryor and J.P. to McDonald's. The struggle continued in the McDonald's parking lot and culminated in Pryor exiting the vehicle and R.H. driving away. The second incident, on December 6, 2021, involved another physical altercation as R.H. drove Pryor and J.P. During the incident, R.H. exited the vehicle and Pryor drove away in R.H.'s vehicle with J.P. in the back seat. Following the incident, Pryor evaded law enforcement for several hours before being apprehended in the attic of a nearby residence.

{¶3} On January 13, 2022, Pryor was indicted in two separate cases. In Allen County case number CR 2022 0009, which relates to the November 28, 2021 incident, Pryor was indicted on a single count of domestic violence in violation of R.C. 2919.25(A), (D)(4), third-degree felony. In Allen County case number CR 2021 0440, which relates to the December 6, 2021 incident, Pryor was indicted on six counts: Count One of domestic violence in violation of R.C. 2919.25(A), (D)(4), a third-degree felony; Count Two of kidnapping in violation of R.C. 2905.01(A)(2), (C)(1), a first-degree felony; Count Three of grand theft of a motor vehicle in violation of R.C. 2913.02(A)(1), (B)(5), a fourth-degree felony; Count Four of kidnapping in violation of R.C. 2905.01(A)(2), (C)(1), a first-degree felony; Count Five of kidnapping in violation of R.C. 2905.01(A)(3), (C)(1), a first-degree felony;

and Count Six of burglary in violation of R.C. 2911.12(A)(2), (D), a second-degree felony. On January 20, 2022, Pryor entered written pleas of not guilty to the counts in the indictments.

{¶4} A jury trial on the consolidated cases was held on June 21-23, 2022. At the trial, R.H. testified she was in a "toxic" relationship with Pryor for approximately four years and that Pryor is the father of her one-year-old son, J.P. (June 21-23, 2022 Tr. at 135-136, 201, 203-204). R.H. stated that on November 28, 2021, she drove Pryor and J.P. to a McDonald's restaurant in Shawnee. (*Id.* at 137-138, 207-208). However, on the way to the restaurant, Pryor accused R.H. of "talking to someone" and "got mad." (*Id.* at 138). As R.H. continued driving, Pryor began hitting her "multiple times" in the face as R.H. covered her face with her hand. (*Id.* at 139-140, 144-145, 228-230).

{¶5} When they arrived in the McDonald's parking lot, R.H. quickly parked the car, exited the vehicle, and attempted to remove J.P. from his car seat to take him inside the restaurant. (June 21-23, 2022 Tr. at 140). However, she was unable to remove the child from the car because Pryor hopped into the driver's seat and started driving away. (*Id.* at 140, 232). According to R.H., this prompted her to get in front of the car, slam her hands on the hood, and start screaming and pleading for Pryor to stop the vehicle. (*Id.* at 140, 231-232). Eventually, Pryor complied and exited the vehicle. (*Id.* at 140). R.H. recalled that she and Pryor continued to yell at each other until a bystander threatened to call the police. (*Id.* at

141, 230-231). The security footage from McDonald's on November 28, 2021 was played for the jury. (State's Ex. 1); (June 21-23, 2022 Tr. at 141-145). The video depiction of the incident generally corroborated R.H.'s testimony. (State's Ex. 1).

{¶6} R.H. testified that Pryor left the parking lot and she drove home. (June 21-23, 2022 Tr. at 145, 235-236). She explained that she did not immediately report the incident to police because she did not want Pryor to be in trouble. (*Id.* at 145). However, later that day, her hand "was hurting really bad" as a result of Pryor hitting it so many times, prompting R.H. to report the incident to the Shawnee Township Police Department. (*Id.*). R.H. stated that Pryor inflicted several injuries during the encounter, including bruising on her hand and a small bruise on her temple. (*Id.* at 146). Several photographs of the injuries, taken on November 28, 2021, were published to the jury. (State's Exs. 2, 3, 4); (June 21-23, 2022 Tr. at 146-150). R.H. stated that, as a result of the November 28, 2021 incident and other domestic-violence situations, she entered into a voluntary safety plan with the Allen County Children's Services Board that specified that R.H. and J.P. were not to be in contact with Pryor. (June 21-23, 2022 Tr. at 152-153, 205).

{¶7} Jeffrey Marchal ("Marchal") testified that on November 28, 2021 he heard a "blood curdling scream" coming from the McDonald's parking lot. (June 21-23, 2022 Tr. at 262-263). Marchal observed a man in the passenger's seat of a vehicle punching a woman in the driver's seat using a closed fist. (*Id.* at 263-264). Marchal admitted that, due to his vantage point he did not see the punches "connect"

but that his observations made it obvious to him that "someone must be getting . . . beat[en]." (*Id.* at 264, 267, 269).

{¶8} Officer Cody Warris ("Officer Warris"), a patrol officer with the Shawnee Township Police Department, testified that on November 28, 2021, he was dispatched to McDonald's at approximately 11:15 a.m. to investigate a domestic violence dispute. (*Id.* at 280-282). When Officer Warris arrived on scene, he spoke to a witness who indicated that the female had driven away but that the male had entered a Mexican restaurant located near McDonald's. (*Id.* at 282-283). Officer Warris entered the Mexican restaurant and spoke to the man, who he identified as Pryor. (*Id.* at 283-284). Pryor denied he was arguing with "his girl" and refers to the girl in the car as "an old chick I used to mess with." (State's Ex. 23). Pryor also denied he was ever in the car, instead stating that his uncle dropped him off at McDonald's and the girl approached him in the parking lot "arguing, screaming, and yelling." (State's Ex. 23). Pryor also claimed nothing "physical" happened between them. (State's Ex. 23).

{¶9} Later that day, Officer Warris met R.H. and photographed her injuries. (June 21-23, 2022 Tr. at 289-293, 295-298); (State's Exs. 2, 3, 4). Officer Warris opined that the injuries that he observed to R.H. indicated to him that "something physical" had occurred. (June 21-23, 2022 Tr. at 300-301).

{¶10} Detective Jack Miller ("Det. Miller"), a detective with the Shawnee Township Police Department, testified that he interviewed Pryor several days after

the incident. (June 21-23, 2022 Tr. at 304-305). Det. Miller testified that based on his training and experience, he did not believe Pryor was being entirely truthful during the interview due to inconsistencies in Pryor's story. (*Id.* at 308-309).

{¶11} Pryor testified in his own defense and stated that on November 28, 2021, he met R.H. and J.P. at church. (*Id.* at 619-621). After the service, Pryor agreed to ride with his uncle to meet R.H. and J.P. at McDonald's for breakfast. (*Id.* at 621). However, on the way there, Pryor's uncle received a work-related call and so, they met R.H. and J.P. in a nearby parking lot. (*Id.* at 622-623).

{¶12} According to Pryor, as soon as he entered R.H.'s car, they began arguing about Pryor's ex-girlfriend contacting him. (June 21-23, 2022 Tr. at 622). Pryor alleges that he upset R.H. by Pryor "defending the other girl," prompting R.H. to hit him. (*Id.* at 622-624). In response, Pryor pushed R.H.'s arm, causing R.H. to become "irate and [begin] crying and screaming." (*Id.* at 622-623). Pryor was unable to explain how R.H. got the bruise on her cheek, but opined that R.H. received the bruise on her wrist when he grabbed it. (*Id.*). Pryor explained that when R.H. got out of the vehicle, he jumped into the driver's seat because he is "not an argumentative person" and he did not want to go into McDonald's with R.H. "acting like that" and causing a scene. (*Id.* at 624-625). Pryor stated that, when the cops approached him at the Mexican restaurant shortly thereafter, he denied knowing R.H. because he did not want her to be in trouble for continuing to associate with him. (*Id.* at 623-626).

{¶13} R.H. also testified to the incident that occurred on December 6, 2021. (*Id.* at 153). R.H. stated that, on that morning, she received a call from Pryor asking for a ride. (*Id.* at 153, 206). Although she initially denied Pryor's request, she relented when Pryor threatened to come to her if she refused. (*Id.* at 153-154, 207-208, 236-237). So, R.H., with J.P. in the back seat, drove to Pryor's father's shop at 910 Vine Street in Lima, Allen County, Ohio, to pick up Pryor. (*Id.* at 154, 207).

{¶14} When R.H. and J.P. arrived at the shop, R.H. leaned across the seat to unlock the passenger-side door for Pryor. (June 21-23, 2022 Tr. at 155, 237). According to R.H., Pryor got into the car and immediately "started hitting" her in the face and head while accusing her of cheating on him. (*Id.* at 155, 237-238). R.H. tried to get out of the parked car, but Pryor pulled her into the car by her hair. (*Id.* at 155-156, 245). Unable to exit the car, R.H. began driving as Pryor continued hitting her face. (*Id.* at 155-156). Pryor also held onto the back of R.H.'s sweatshirt while she drove so she was unable to jump out of the car. (*Id.* at 240, 259). When Pryor ignored R.H.'s pleas to stop hitting her, R.H. stopped the car, got out, and screamed for help. (*Id.* at 157, 239-241). After R.H. exited the vehicle, Pryor hopped into the driver's seat and drove away with J.P. in the back seat. (*Id.* at 156-158).

{¶15} R.H. received help from a bystander who witnessed some of the incident and called the police. (June 21-23, 2022 Tr. at 159). R.H. was assessed by medics and transported to the hospital by ambulance. (*Id.* at 160-161, 248). R.H.

testified that as a result of the incident on December 6, 2021 she had a swollen nose, bruised and swollen ears, blood on her nose, and various bruising on her face. (*Id.* at 158). The State introduced photographs depicting the injuries. (State's Exs. 6, 7, 8, 9, 12, 14, 16, 17, 18, 19, 20, 21); (June 21-23, 2022 Tr. at 161-164, 171-190, 256-257). Several of the photographs also depicted R.H.'s hair in a state of disarray, which R.H. alleged was caused by Pryor pulling her hair. (State's Exs. 6, 7, 8); (June 21-23, 2022 Tr. at 163).

{¶16} R.H. stated that later she spoke to Pryor, who was in jail, and he informed her that her car was located at an apartment building at 610 Scott Street. (*Id.* at 165-167, 250). The State introduced photographs depicting the inside and outside of the vehicle after it was recovered on Scott Street. (June 21-23, 2022 Tr. at 168-171); (State's Exs. 9, 10, 11). Several of the photographs depict a clump of long blonde hair on a sweatshirt located on the console between the front seats. (State's Exs. 11, 12); (June 21-23, 2022 Tr. at 170-171). R.H. stated that the sweatshirt was sitting on the center console during the incident and that the hair on the garment was the result of Pryor pulling her hair and trying to keep her in the car. (June 21-23, 2022 Tr. at 170-171, 175-176, 248-250, 258); (State's Ex. 12).

{¶17} R.H. admitted that she has a past conviction for falsification, which she explained was the result of her not being truthful with law enforcement in an effort to protect Pryor. (June 21-23, 2022 Tr. at 190, 212). She further admitted that there have been additional instances where she has not been truthful or has not

cooperated with law enforcement or the court system in order to protect Pryor. (*Id.* at 190, 212-214, 224). R.H. stated, "I guess I lie so [Pryor] don't [sic] get in trouble." (*Id.* at 226). However, R.H. stated that she was truthful with law enforcement in their investigation and in her testimony at trial with respect to the November 28, 2021 and December 6, 2021 incidents. (*Id.* at 191, 206).

{¶18} Renee Wagoner ("Wagoner") testified that on December 6, 2021 she was standing in the window of her home at 780 Holly Street in Lima, Ohio when she heard a female voice screaming for help. (*Id.* at 318-320, 328-329). Wagoner looked outside and observed R.H.'s head "flopping up and down" as someone in the passenger seat held onto her hair. (*Id.* at 320-321). Wagoner described R.H's "head bopping" "because he was beating her." (*Id.* at 333-334). Wagoner ran outside to assist and observed the car speed away. (*Id.* at 321-322). Wagoner helped R.H. out of the road and called 9-1-1. (*Id.* at 322-323). Wagoner described the injuries she observed on R.H., including blood on her face and redness on her neck. (*Id.* at 324-325). Wagoner also recalled R.H.'s hair being disheveled. (*Id.*).

{¶19} Sergeant Tanner Engle ("Sgt. Engle"), an officer and canine handler with the Lima Police Department, testified that on December 6, 2021, he was dispatched to the 700 block of Holly Street for a report of a woman crying in the street. (June 21-23, 2022 Tr. at 345-346). When Sgt. Engle arrived on the scene, he observed a female standing in the street who appeared "very emotionally distraught" and upset. (*Id.* at 347-348, 390). Sgt. Engle recalled observing dried

blood around R.H.'s nose and face and described her face as "red." (*Id.* at 350-352). Sgt. Engle testified that the injuries he observed were consistent with the version of events that R.H. provided him. (*Id.* at 351-352). Additionally, he spoke to Wagoner whose observations were consistent with R.H.'s version of events. (*Id.* at 353).

{¶20} Later that day, Sgt. Engle heard over the radio that officers were requested to 812 Weadock Avenue and were advised that the resident returned home from a short time away and discovered that the doors to his house were locked despite the homeowner leaving the doors unlocked when he left. (*Id.* at 365-368). Officers forced entry into the residence at 812 Weadock Avenue and searched the residence. (*Id.* at 367-368). State's Exhibit 30, Sgt. Engle's body-worn-camera footage of the search of 812 Weadock Avenue, was played for the jury. (June 21-23, 2022 Tr. at 370-371); (State's Ex. 30). Before entering the residence and many times throughout the search, officers were heard announcing "police department" to avoid a physical or violent confrontation with the suspect. (June 21-23, 2022 Tr. at 371-373); (State's Ex. 30). State's Exhibit 30 depicts officers beginning on the ground floor and searching each room. (State's Ex. 30). In the attic, one of the officers spotted Pryor hiding in the ceiling. (State's Ex. 30); (June 21-23, 2022 Tr. at 374-375). Eventually, Pryor responded to officers and officers assisted in lowering down Pryor, who was covered in insulation, from the attic's ceiling. (June 21-23, 2022 Tr. at 371, 382). Pryor surrendered and was taken into custody. (*Id.* at 384-385); (State's Ex. 31).

**{¶21}** Detective Steven Stechschulte ("Det. Stechschulte") testified that on December 6, 2021, he responded to the hospital to speak to R.H. (*Id.* at 458-459). Det. Stechschulte described R.H. as "cooperative" and stated that the testimony R.H. gave during the trial was consistent with the version of events that she gave him in the hospital and throughout the investigation. (*Id.* at 460-462, 549). Det. Stechschulte testified that he has specialized training in domestic violence and has been a domestic-violence instructor for police recruits for over twenty years. (*Id.* at 455-457, 463). Based on that training and experience, Det. Stechschulte opined that the injuries he observed to R.H. in the hospital were consistent with R.H.'s version of events. (*Id.* at 463-464, 490-491).

**{¶22}** After leaving the hospital, Det. Stechschulte searched several locations for Pryor or R.H.'s vehicle. (June 21-23, 2022 Tr. at 465-466). Then, he returned to 910 Vine Street to conduct surveillance. (*Id.* at 466-468, 470). Eventually, Det. Stechschulte observed Pryor enter the building, holding J.P. (*Id.* at 471-472). Several minutes later, Pryor walked out of the building without the child. (*Id.* at 472-473). Det. Stechschulte, concerned about J.P.'s safety, drove across the street into the parking lot of the business and instructed Pryor to get his hands up and get onto the ground. (*Id.* at 473-474). Det. Stechschulte recalled that Pryor did not initially follow the commands, and started to put his hands in his pockets, so Det. Stechschulte reached into his car, grabbed his gun, pointed it in

Pryor's direction, and gave loud verbal commands instructing Pryor to get on the ground and keep his hands up. (*Id.*).

**{¶23}** According to Det. Stechschulte, Pryor immediately began talking to him, calling him "Stechschulte" because they "are very familiar with each other." (*Id.* at 474, 536, 540, 550). Pryor eventually complied with Det. Stechschulte's instructions. (*Id.* at 475, 536-537). However, when Det. Stechschulte phoned dispatch to summon additional officers, Pryor was able to ascertain that Det. Stechschulte did not have backup. (*Id.* at 475). So, Pryor got up and started running. (*Id.*). Det. Stechschulte recalled giving "loud verbal commands" instructing Pryor to stop and continued yelling, "Stop, police!" (*Id.*). Det. Stechschulte lost sight of Pryor near 812 Weadock Avenue. (*Id.* at 476-477).

**{¶24}** Concerned about J.P., who was still located at 910 West Vine Street, Det. Stechschulte went back to the shop where he located J.P., unharmed. (*Id.* at 476-478). After returning the child to R.H., Det. Stechschulte returned to the area to continue searching for Pryor. (*Id.* at 477-479). Det. Stechschulte was present at 812 Weadock Avenue when Pryor was apprehended in the residence. (*Id.* at 479-480).

**{¶25}** Det. Stechschulte testified that he was involved in previous occasions when R.H. was not truthful with law enforcement and the court regarding Pryor's past actions toward her. (June 21-23, 2022 Tr. at 494). Det. Stechschulte testified that when R.H. was untruthful in the past, it was an effort to protect Pryor from

getting into trouble for his actions, rather than in an effort to get Pryor convicted of crimes he did not commit. (*Id.* at 494-495, 514-516, 546-548). R.H.'s actions "[w]ere always to protect [Pryor]." (*Id.* at 495). Det. Stechschulte testified that it is common in domestic-violence cases for victims to stop cooperating with law enforcement. (*Id.* at 495, 517-518). Regarding his past interactions with Pryor and R.H., Det. Stechschulte stated that he is "very familiar" with them and has dealt with them "on a number of cases." (*Id.* at 514).

{¶26} Pryor testified that he called R.H. on December 6, 2021 to ask for a ride to his friend's house so that he could loan the friend some money. (*Id.* at 625-627). Pryor stated that when R.H. arrived, she accused Pryor of being unfaithful, prompting a verbal disagreement. (*Id.* at 627). Pryor testified that the verbal argument continued despite his efforts to deescalate the situation. (*Id.* at 627-628). Pryor stated that as they turned onto Holly Street, R.H. began hitting him, causing the vehicle to swerve. (*Id.* at 628). Pryor recalled that he held onto R.H.'s wrist and put the car in park, causing the vehicle to come to an abrupt stop. (*Id.*). Pryor denied hitting R.H., but stated that he grabbed her hand and pushed her away. (*Id.* at 631-632).

{¶27} Then, Pryor drove to his friend's apartment at 610 South Scott Street to drop off money. (June 21-23, 2022 Tr. at 628-630). However, when he returned to the car, it would not start. (*Id.* at 628-629, 634-636). Pryor stated that he and J.P. then received a ride to his father's Vine Street shop. (*Id.* at 629, 635).

{¶28} Pryor opined that R.H. received the injuries to her face by hitting her face on the steering wheel when he put the car into park. (*Id.* at 632, 655). He denied knowing how R.H. sustained injuries to the right side of her face. (*Id.* at 632). However, he admitted that it was possible that he struck her nose or face when he "mugged her" and pushed her off of him. (*Id.* at 632-633, 653-654).

{¶29} According to Pryor, when he returned to his father's shop on Vine Street, he noticed a car in the area before he walked inside. (June 21-23, 2022 Tr. at 636). Shortly thereafter, Pryor walked outside again, leaving J.P. in the building, and the car he previously noticed "came [after]" him. (*Id.* at 639). Pryor described the car as driving toward him "pretty fast" which caught him off guard. (*Id.*). Then, an unknown person jumped out of the car and pointed a gun at him. (*Id.*). Pryor stated that he put his hands up, said, "Don't shoot!", tucked his head down, closed his eyes, and took off without looking at his perceived assailant. (*Id.*). Pryor stated that he thought R.H. sent someone to hurt him and denied knowing he was running from the police. (*Id.* at 641-642). Rather, he believed he was "running for [his] life." (*Id.* at 642-643). Pryor entered what he perceived to be an abandoned house and hid in the attic. (*Id.* at 643, 664-665). Pryor denied hearing the police announce themselves until they entered the attic. (*Id.* at 643). Pryor alleged that when he heard the officers he immediately complied with their instructions. (*Id.*).

{¶30} Pryor admitted he had past interactions with Det. Stechschulte, beginning eight years prior. (*Id.* at 646-648). He also recalled speaking to Det.

Stechschulte in an interview in 2020. (*Id.* at 648-649). He further admitted that he has three prior convictions for domestic violence, felony convictions for possession of cocaine and burglary, and four probation violations. (*Id.* at 651-653, 657, 660).

{¶31} Pryor was found guilty of the sole count of domestic violence in case number CR 2022 0009. With respect to case number CR 2021 0440, Pryor was found guilty of Count One (domestic violence), and Count Six (burglary). The jury found Pryor not guilty of grand theft; however, the jury found Pryor guilty of the lesser-included offense of unauthorized use of a vehicle. The jury also found Pryor not guilty of Counts Two, Four, and Five (kidnapping). The trial court accepted the verdicts and ordered a PSI.

{¶32} Pryor appeared for sentencing on August 10, 2022. In case number CR 2022 0009, the trial court sentenced Pryor to 30 months in prison. In case number CR 2021 0440, the trial court sentenced Pryor to 36 months in prison on Count One (domestic violence), 90 days of local incarceration on Count Three (unauthorized use of a vehicle), and an indefinite term of 4 to 6 years in prison with respect to Count Six (burglary). The trial court ordered the sentences for Counts One and Six to be served consecutively to one another and consecutively to the prison term imposed in case number CR 2022 0009 for an aggregate term of a minimum of 9 years and 6 months and a maximum term of 11 years and 6 months in prison. The trial court filed its judgment entries of sentence the following day.

**{¶33}** Pryor filed notices of appeal on August 22, 2022. On October 4, 2022, Pryor filed motions for leave to file for a new trial based on jury misconduct. The proffered motions alleged jury misconduct on the basis that R.H. and one of the jurors were co-workers. The State filed its opposition to Pryor's motions for leave to file for a new trial. Due to the pending appeals, the trial court was divested of jurisdiction to consider the motions. However, on February 23, 2023, this Court stayed the appeals and ordered the matters be remanded for the trial court to decide Pryor's motions for leave to file for a new trial.

**{¶34}** On March 16, 2023, Pryor refiled his motions for leave of court to file for a new trial based on jury misconduct and simultaneously filed his motions for a new trial. The State subsequently filed its opposition to Pryor's motions for new trial. On June 13, 2023, the trial court filed its judgment entries granting Pryor's motions for leave to file for a new trial but denying Pryor's motions for a new trial.

**{¶35}** Pryor filed notices of appeals on July 11, 2023. He raises three assignments of error for our review.

### First Assignment of Error

**Because the jury lost its way and created a manifest miscarriage of justice in convicting Appellant, Appellant's convictions, in both case number CR-2021-0440 and CR-2022-0009, were against the manifest weight of the evidence.**

**{¶36}** In his first assignment of error, Pryor argues that his convictions are against the manifest weight of the evidence.

*Standard for Manifest-Weight Review*

**{¶37}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Pryor's Convictions*

**{¶38}** Pryor was found guilty of two counts of domestic violence, one count of unauthorized use of a vehicle, and one count of burglary.

**{¶39}** The offense of domestic violence is codified at R.C. 2919.25(A) and provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." "A person acts knowingly, regardless of

-18-

purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Additionally, "[a] person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.*

{¶40} Pryor was also convicted of unauthorized use of a vehicle, which is codified under R.C. 2913.03 and provides "[n]o person shall knowingly use or operate a . . . motor vehicle . . . without the consent of the owner or person authorized to give consent." R.C. 2919.03(A).

{¶41} Finally, Pryor was convicted of burglary in violation of R.C. 2911.12(A)(2), which states "[n]o person, by force, stealth, or deception, shall . . . [t]respass in an occupied structure or in a separately secured or separated occupied portion of an occupied structure . . ., with purpose to commit in the habitation any criminal offense." The predicate "criminal offense" was obstructing official business or failure to comply with an order of a police officer.

*Domestic Violence*

{¶42} Pryor was convicted of two counts of domestic violence – one in case number CR 2022 0009 relating to the incident on November 28, 2021 and one in case number CR 2021 0440 relating to the December 6, 2021 incident. In both cases, Pryor's arguments relate chiefly to Pryor's contention that R.H. was not credible and that the jury erred by finding her version of events more credible than his. Specifically, Pryor references R.H.'s prior conviction for falsification and

admission that she has a history of not being truthful with law enforcement and the court system.

**{¶43}** However, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). "'Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact.'" *State v. Cox*, 2022-Ohio-571, ¶ 20 (3d Dist.), quoting *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.), citing *DeHass*, 10 Ohio St.2d, at paragraph one of the syllabus. "'The trier of fact is best able "to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proferred testimony."'" *State v. Brentley*, 2023-Ohio-2530, ¶ 33 (3d Dist.), quoting *Banks* at ¶ 13, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984).

**{¶44}** Notably, the jury had the opportunity to observe R.H. and Pryor testify at trial. Based upon our review of the record, it is clear that the jury found R.H. to be more credible. "It is within the province of the jury to parse out the credible portions of the witnesses' testimonies." *State v. Waller*, 2023-Ohio-493, ¶ 20. The record sufficiently supports the jury's credibility assessments, and we find no basis to alter its analysis.

**{¶45}** Furthermore, in reviewing the evidence presented at trial, R.H.'s testimony was corroborated by multiple sources. For instance, with respect to the November 28, 2021 incident, Marchal observed a male making striking motions with his arm while a female screamed. Additionally, security footage from the McDonald's parking lot is consistent with R.H.'s version of events. Officer Warris testified that based on his observations, something physical in fact occurred between R.H. and Pryor, despite Pryor's statements to the contrary. Likewise, Det. Miller, who interviewed Pryor with respect to the November 28, 2021 incident, testified that he did not believe Pryor was being entirely truthful during his recorded interview due to inconsistencies in his story.

**{¶46}** Regarding the December 6, 2021 incident, Wagoner, who witnessed the incident and aided R.H. in its immediate aftermath, corroborated R.H.'s testimony with her own observations of someone holding onto R.H.'s hair while R.H.'s head "flopp[ed] up and down." (June 21-23, 2022 Tr. at 320-321). Sgt. Engle, who arrived on the scene to assist R.H., testified that the injuries he observed were consistent with the version of events R.H. provided him. Det. Stechschulte, who was familiar with R.H. and Pryor and had specialized training and experience investigating domestic violence cases, testified that R.H.'s version of events remained consistent throughout the investigation and trial.

**{¶47}** Furthermore, although R.H. admitted to a history of lack of candor with law enforcement and the court system, she and Det. Stechschulte clarified that

her past lack of candor was the result of her desire to protect Pryor from getting into trouble for his actions. Det. Stechschulte further testified that, in his experience, it is not uncommon for victims of domestic violence to lie to protect their abuser.

{¶48} Although Pryor denied he knowingly caused harm to R.H. and testified that his actions were in self-defense, the jury was free to believe R.H.'s version of events. Accordingly, we find Pryor's convictions for domestic violence are not against the manifest weight of the evidence.

*Burglary*

{¶49} Pryor contends that his burglary conviction is against the manifest weight of the evidence because he did not recognize Det. Stechschulte as a law enforcement officer, and therefore, he did not know he was being pursued by police until officers called out his name while searching the attic. Accordingly, he alleges that he lacks the requisite "purpose" of entering the residence to commit a criminal offense.

{¶50} Again, Pryor's arguments focus chiefly on his contention that the jury should have believed his version of events rather than the State's version. Indeed, Pryor testified that, although he admittedly had prior interactions with Det. Stechschulte, he did not recognize him on December 6, 2021 and instead believed that he was being pursued by someone acting on R.H.'s behalf. However, Det. Stechschulte provided testimony that when he engaged Pryor on December 6, 2021, Pryor immediately recognized him, even calling Det. Stechschulte by name. He

further testified that during his pursuit of Pryor he continually identified himself as law enforcement by yelling "Stop, police!" Det. Stechschulte stated that he was wearing a suit rather than a uniform and was driving an unmarked department-issued vehicle. The jury also had the opportunity to view body-worn camera footage of law enforcement's search of 812 Weadock Avenue and would have been in a position to assess the credibility of Pryor's contention that he was unaware law enforcement was searching for him until they were calling out his name in the attic of the residence.

{¶51} After reviewing the evidence, we do not find that the jury lost its way by believing the State's version of events over Pryor's version. Accordingly, we find Pryor's conviction for burglary is not against the manifest weight of the evidence.

*Unauthorized Use of a Vehicle*

{¶52} Pryor summarily alleges that his conviction for unauthorized use of a vehicle is against the manifest weight of the evidence due to R.H.'s lack of credibility. However, as addressed in detail with respect to Pryor's arguments relating to his domestic-violence convictions, the jury was free to believe the State's version of events over Pryor's version. After reviewing the record, we do not find that the jury lost its way by convicting Pryor of unauthorized use of a vehicle. Thus, we do not find Pryor's conviction for unauthorized use of a vehicle to be against the manifest weight of the evidence.

*Conclusion*

**{¶53}** Having found none of Pryor's convictions to be against the manifest weight of the evidence, we overrule his first assignment of error.

### Second Assignment of Error

**Because the trial court abused its discretion and acted in an arbitrary, unreasonable, and capricious manner in ruling on Appellant's Motion for New Trial in both case number CR-2021-0440 and CR-2022-0009, the trial court abused its discretion in denying Appellant's Motion for New Trial, in both case numbers CR-2021-0440 and CR-2022-0009, in violation of Appellant's right to Due Process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 5 and 10 of the Ohio Constitution.**

**{¶54}** In his second assignment of error, Pryor argues that the trial court erred by denying his delayed motion for a new trial. Pryor alleges that, after the trial, he discovered R.H. and one of the jurors were coworkers. Pryor contends this relationship, as well as R.H. and the juror's failure to disclose their status as co-workers, deprived him of a fair trial. We disagree.

*Standard of Review and Relevant Law*

**{¶55}** An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "A determination on a Crim.R. 33 motion for a new

trial is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Fisher*, 2021-Ohio-3788, ¶ 16 (3d Dist.).

**{¶56}** Pryor filed his motion for a new trial pursuant to Crim.R. 33(A)(2), which provides as follows, "A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights: * * * (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state[.]" A new trial shall not be granted "unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial." Crim.R. 33(E)(5). Moreover,

> Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.

Crim.R. 33(B).

**{¶57}** "In addressing claims of juror misconduct, a court must employ a two-step analysis. First, a court will determine whether juror misconduct occurred, and second, if juror misconduct is found, the court will determine whether the misconduct materially affected the defendant's substantial rights." *Fisher* at ¶ 19, citing *State v. Taylor*, 73 Ohio App.3d 827, 833 (4th Dist. 1991) and *State v. Samatar*, 2003-Ohio-1639, ¶ 35 (10th Dist.). "The party complaining of alleged

juror misconduct must establish prejudice." *Id.*, citing *State v. Edwards*, 2019-Ohio-3012, ¶ 52 (10th Dist.).

*Analysis*

{¶58} In order to determine whether jury misconduct occurred, we must review the matter in its proper context. In his motion for a new trial, Pryor alleges that he recently learned that Juror Two and R.H. were co-workers and that neither person disclosed this fact at any point during the trial. He argues that because neither R.H. nor the juror disclosed the information, he was unable to discover this fact within 14 days. He contends that Juror Two and R.H.'s status as co-workers constituted misconduct that materially affected his right to a fair trial.

{¶59} Attached to the motion for a new trial is an affidavit of the victim, R.H, dated October 25, 2022. The salient points of her affidavit are as follows:

1. I work at Bob Evans Farms in Lima, Ohio.

2. I have worked there since April 6, 2022.

3. [Juror Two] also works at Bob Evans Farms in Lima, Ohio.

4. [Juror Two] has worked at Bob Evans Farms for the entirety of my time there.

5. Only after a recent conversation with [Juror Two] did I realize she was on the jury.

(Case No. CR 2021 0440, Doc. No. 179); (Case No. CR 2022 0009, Doc. No. 72).

{¶60} After reviewing the affidavit in the context of the record, the trial court found that Pryor failed to satisfactorily allege that (1) juror misconduct occurred and

-26-

(2) he was prejudiced by the fact that R.H. and Juror Two were co-workers. After reviewing the record, we agree.

{¶61} During voir dire, the trial court stated, "I'm going to have the lawyers read the list of potential witnesses in this case, some are local and some may be out of towners, I'm not exactly sure, but these are potential witnesses. It doesn't mean everyone on the list will testify but potentially they may." (June 21-23, 2022 Tr. at 14-15). The State then read the list of potential witnesses, with R.H.'s name being read first. (*Id.* at 15). The trial court then asked the potential jurors if they recognized any of the names. (*Id.*). However, none of the prospective jurors, including Juror Two, indicated that they knew R.H., although some prospective jurors indicated that they knew other potential witnesses. (*Id.* at 15-20). Shortly thereafter, the trial court asked, "[Is] [a]nyone here an employer or employee or your spouse, your parent, your child thereof of [R.H.], who is one of the alleged victims in this case[,] or the defendant[,] Mr. Pryor?" (*Id.* at 20). Again, none of the prospective jurors indicated in the affirmative. (*Id.* at 20-21). R.H. was the State's first witness. Furthermore, the record indicates that after testifying, R.H. remained in the courtroom for at least a portion of the ongoing proceedings.

{¶62} Pryor alleges that Juror Two engaged in misconduct by not indicating that she recognized R.H. from her employment at Bob Evans Farms. Pryor argues that because Juror Two and R.H. were coworkers, working at the same factory at the time of the trial, he was denied the right to a fair trial as follows:

First it would have impacted [Juror Two's] perception of the case. Knowing that the State's witness, R.H., was a coworker would have led [Juror Two] to unfairly assign greater credibility to R.H.'s testimony than [Juror Two] otherwise would have. This led to Pryor's conviction on all charges.[1] Even though R.H.'s testimony was less critical to the State's evidence on the Burglary charge, [Juror Two] would have unfairly assigned more credibility to R.H., and by extension, less credibility to Pryor—who testified in his own defense regarding the circumstances of his arrest. Thus, [Juror Two's] juror misconduct, in the form of nondisclosure of being a coworker of R.H., prejudiced Pryor and violated his rights to Due Process and a fair trial, as it led to his conviction on each of the charges of which Pryor was convicted.

(Appellant's Brief at 15-16). Pryor also alleged that Juror Two's alleged nondisclosure of her employment limited his trial counsel's ability to represent Pryor during voir dire.

{¶63} However, Pryor's claims are speculative and not supported by the record. First, the record before us, including R.H.'s affidavit, does not establish that Juror Two recognized R.H. from her employment at Bob Evans Farms. Rather, R.H.'s affidavit indicates that she herself was not aware of her and Juror Two's shared employment until a "recent conversation" shortly before her affidavit was signed on October 25, 2022. (Case No. CR 2021 0440, Doc. No. 179); (Case No. CR 2022 0009, Doc. No. 72). Thus, it stands to reason that Juror Two may not have recognized R.H. as a co-worker, particularly in light of R.H.'s statement that she had only been employed at Bob Evans Farms since April 6, 2022, only a little over

---

[1] Pryor was not, in fact, convicted on all charges, as he erroneously contends in his appellant's brief. Indeed, Pryor was acquitted of a number of counts, including three charges of kidnapping.

two months prior to the commencement of trial. (*Id.*); (*id.*). This possibility is bolstered by the trial court's statements in its judgment entry that it had knowledge that "Bob Evans Farms is a factory that operates all day, every day and employs quite a number of people for all shifts." (Case No. CR 2021 0440, Doc. No. 184); (Case No. CR 2022 0009, Doc. No. 76). Thus, the record does not establish that Juror Two failed to honestly disclose her relationship with R.H.

{¶64} Furthermore, even if Juror Two did indeed realize that she and R.H. were co-workers and failed to disclose the relationship, Pryor has not demonstrated that he was prejudiced by this nondisclosure. Although Pryor's argument assumes Juror Two's connection with R.H. resulted in Juror Two assigning greater credibility to R.H.'s testimony, there is no information in the record indicating this is true. In fact, it is possible that Juror Two's acquaintance with R.H. was not a positive one. Furthermore, the jury found Pryor not guilty of several offenses involving R.H. as a victim, undermining Pryor's argument that Juror Two and R.H.'s relationship as co-workers prejudiced him. "'[M]isconduct of a juror will not be presumed, but must be affirmatively proved. The law presumes proper conduct on the part of the jury.'" *State v. Sealey*, 2019-Ohio-3692, ¶ 35 (2d Dist.), quoting *State v. Sapp*, 1995 WL 491390, *7 (10th Dist. 1995). "To demonstrate prejudice, the moving party must show that an accurate response from the juror would have provided a valid basis for a challenge for cause." *State v. Kovacic*, 2017-Ohio-9102, ¶ 15 (11th

Dist.). After reviewing the record, we do not find Pryor properly showed that any nondisclosure prejudiced him.

{¶65} Accordingly, Pryor's second assignment of error is overruled.

### Third Assignment of Error

**Because the counts named on the trial court's verdict forms did not match the counts as named in the Indictment, the trial court's verdict forms, with respect to Appellant's convictions for Domestic Violence and Burglary in case number CR-2021-0440, did not comply with R.C. 2945.75, and the verdict was insufficient to support Appellant's conviction for Domestic Violence as a third-degree felony, or Burglary as a second-degree felony, in violation of Appellant's right to Due Process and trial by jury under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5 and 10 of the Ohio Constitution.**

{¶66} In his third assignment of error, Pryor argues that the verdict forms for his convictions for domestic violence and burglary in case number CR 2021 0440 do not comply with R.C. 2945.75, violating his rights to due process and trial by jury. Accordingly, Pryor argues that his conviction for domestic violence must be reduced from a third-degree felony to a first-degree misdemeanor and that his conviction for burglary must be reduced from a second-degree felony to a fourth-degree felony.

{¶67} In support of his argument, Pryor relies upon R.C. 2945.75, which provides:

(A) When the presence of one or more additional elements makes an offense one of more serious degree:

> (1) The affidavit, complaint, indictment, or information either shall state the degree of the offense which the accused is alleged to have committed, or shall allege such additional element or elements. Otherwise, such affidavit, complaint, indictment, or information is effective to charge only the least degree of the offense.
>
> (2) A guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.

{¶68} R.C. 2919.25, which codifies the offense of domestic violence, provides in pertinent part:

> (A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.
> . . .
> (D)(1) Whoever violates this section is guilty of domestic violence, and the court shall sentence the offender as provided in divisions (D)(2) to (6) of this section.
>
> . . .
>
> (4) If the offender previously has pleaded guilty to or been convicted of two or more offenses of domestic violence or two or more violations or offenses of the type described in division (D)(3) of this section involving a person who was a family or household member at the time of the violations or offenses, a violation of division (A) or (B) of this section is a felony of the third degree, and, if the offender knew that the victim of the violation was pregnant at the time of the violation, the court shall impose a mandatory prison term on the offender pursuant to division (D)(6) of this section, and a violation of division (C) of this section is a misdemeanor of the first degree.

{¶69} Pryor was also convicted of burglary which is codified in R.C. 2911.12 as follows:

> (A) No person, by force, stealth, or deception, shall do any of the following:

. . .

(2) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense;

. . .

(B) No person, by force, stealth, or deception, shall trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present.

. . .

(D) Whoever violates division (A) of this section is guilty of burglary. A violation of division (A)(1) or (2) of this section is a felony of the second degree. A violation of division (A)(3) of this section is a felony of the third degree.

(E) Whoever violates division (B) of this section is guilty of trespass in a habitation when a person is present or likely to be present, a felony of the fourth degree.

{¶70} Pryor's domestic-violence conviction in case number CR 2021 0440 was a felony of the third-degree. At trial, the parties stipulated that Pryor had three prior convictions of domestic violence. Thus, in accordance with R.C. 2945.75(A)(2), the verdict needed to state the degree of the offense or that Pryor had been convicted of three or more convictions for domestic violence. Additionally, Pryor's burglary conviction was enhanced from a fourth-degree trespass in a habitation to burglary, a second-degree felony, based on the State's

allegation that he trespassed in a habitation "with purpose to commit in the habitation any criminal offense." R.C. 2911.12(A)(2), (D).

**{¶71}** Here, case number CR 2022 0009, which involved a single count of domestic violence, was consolidated for trial with the six counts in case number CR 2021 0440. As a result of the consolidation, the trial court renumbered the counts with the sole count in CR 2022 0009 as count one and counts one through six in case number CR 2021 0440 being renumbered as counts two through seven, respectively. Accordingly, although labeled as Count One and Six in the indictment for case number CR 2021 0440, the counts were referenced at trial as Count Two and Count Seven, respectively.

**{¶72}** Thus, Pryor reasons that because the verdict forms reference Count Two and Count Seven, rather than Count One and Count Six, respectively, the verdict forms are insufficient. Pryor alleges that the discrepancy between the counts in the indictment resulted in verdict forms that do not comply with R.C. 2945.75 and could have confused the jury.

**{¶73}** However, the verdict form for Count Two, which corresponds to Count One of the indictment in case number CR 2021 0440, was consistently referenced as Count Two throughout the trial on the consolidated cases. Further, the verdict form referenced Count Two and outlined each of the elements of the offense, including a finding that Pryor had previously been convicted of three offenses of domestic violence. (Case No. CR 2021 0440, Doc. No. 145). Likewise,

the verdict form for Count Seven, which corresponded to Count Six of the indictment in case number CR 2021 0440, consistently referenced the burglary charge as Count Seven and included the finding that Pryor entered the residence "with purpose to commit in the structure any criminal offense, to-wit: obstructing official business or failure to comply with an order of a police officer." (Case No. CR 2021 0440, Doc. No. 151). Accordingly, we find that the verdict forms complied with R.C. 2945.75.

{¶74} Furthermore, the jury was not presented with the indictments, and accordingly, the jury would have been unaware that that counts in case number CR 2021 0440 had been renumbered and would not have conflated the counts in the indictments with the counts in the verdict forms.

{¶75} Thus, Pryor's third assignment of error is overruled.

*Conclusion*

**{¶76}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the Allen County Court of Common Pleas.

***Judgments Affirmed***

**ZIMMERMAN and GWIN, J.J., concur.**

**/jlm**

**\*\*Judge W. Scott Gwin of the Fifth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**