[Cite as *State v. Clapsaddle*, 2025-Ohio-4904.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

DUSTIN RAY CLAPSADDLE,

    DEFENDANT-APPELLANT.

CASE NO. 6-24-17

OPINION AND
JUDGMENT ENTRY

Appeal from Hardin County Common Pleas Court
Trial Court No. CRI 20232147

Judgment Affirmed

Date of Decision: October 27, 2025

APPEARANCES:

    *Karin L. Coble* for Appellant

    *McKenzie J. Klingler* for Appellee

**MILLER, J.**

## I. FACTS AND PROCEDURAL HISTORY

{¶1} On August 16, 2023, the Hardin County Grand Jury indicted Dustin Ray Clapsaddle ("Clapsaddle") on four counts:

1. Rape, in violation of R.C. 2907.02(A)(2);

2. Sexual battery, in violation of R.C. 2907.03(A)(7);

3. Gross sexual imposition ("GSI"), in violation of R.C. 2907.05(A); and

4. Kidnapping, in violation of R.C. 2905.01(A)(4).

The charges stemmed from an incident on January 18, 2019. At the time of the incident, Clapsaddle was a teacher and T.M. was a 17-year-old student in his government class during her junior year of high school. She was also serving as a student aide for Clapsaddle.

{¶2} During the trial, T.M. testified about the incident. That night, she attended a basketball game at the high school as a cheerleader. Clapsaddle attended the game too. After T.M. left the game, she found a note on her car's windshield that said, "Meet me at the church." T.M. realized the note was from Clapsaddle and drove to the church, where she got in Clapsaddle's car. He then drove them to his house because he indicated he had something for her. Upon arriving there, Clapsaddle said he would be right back, but he did not return to the car. After a few minutes, T.M. wanted to go home so she went inside Clapsaddle's house and saw him sitting on the living room couch watching television.

{¶3} According to T.M., Clapsaddle told her to follow him while he retrieved the item he had for her. So she followed Clapsaddle into his bedroom. When they got there, Clapsaddle showed her a memorabilia area and they talked. T.M. testified that she got an uncomfortable feeling, with Clapsaddle engaging in touching her arm and back, "things that were making [her] uncomfortable that . . . could've potentially led into something [she] didn't want it to lead into." (Trial Tr. at 373-374). T.M. then said she had to go and turned to leave the room. Clapsaddle—who T.M. indicated was significantly larger than her physically—came around her from behind, shut the door, and placed his hand on the doorknob. T.M. testified she felt scared and knew she could not leave the room even though she wanted to leave in order to get out of the situation. Apart from Clapsaddle putting his hand on her back before he had shut the door, she could not recall specifically where he touched her. Clapsaddle pushed her down on the bed, with T.M. lying face down and crying, and Clapsaddle "proceeded to do whatever he wanted." (*Id.* at 374). T.M. testified that her "body shut down," Clapsaddle took off her pants, he had sex with her (penetrating her vagina with his penis), and it hurt. (*Id.* at 376-379). Afterward, Clapsaddle walked T.M. out to his car, acted like nothing happened, and drove her back to her car without saying anything about the incident.

{¶4} T.M. reported the incident approximately three years after it took place. T.M. testified that she disclosed the incident to Amy Kohl ("Kohl"), a counselor at the high school, because she felt it was unfair Clapsaddle could continue to be a

teacher and use the "power dynamic" "against any young vulnerable woman again any time he wanted," and T.M. had heard Clapsaddle was making advances towards others. (*Id*. at 482-483).

**{¶5}** Clapsaddle consistently denied any part of the alleged incident ever took place, including that T.M. had never been in his car and she never came to his house that night. Beginning with its opening argument and throughout the entire trial, the Defense attacked T.M.'s credibility. For instance, defense counsel pointed out that T.M. had repeatedly denied anything sexual ever happened between her and Clapsaddle (including when the principal heard rumors two months after the incident and questioned T.M. about it), attacking T.M.'s lengthy delay in reporting the incident, and questioning her motivation in accusing Clapsaddle of committing the crimes. The Defense claimed the allegations stemmed from Clapsaddle's rejection of T.M. attempting to initiate a romantic relationship with him about a year-and-a-half after the incident.

**{¶6}** The jury found Clapsaddle guilty on all four counts. The trial court merged all counts except for the GSI count. The State elected to proceed to sentencing on the rape count. The trial court then sentenced Clapsaddle to nine years in prison for rape and twelve months in prison for GSI, in addition to imposing a $5,000 fine and tier III sexual offender designation. The trial court ordered that the prison terms run consecutively, for a total of ten years in prison. This appeal followed.

## II.     ASSIGNMENTS OF ERROR

{¶7} Clapsaddle raises five assignments of error for our review:

### First Assignment of Error

**The verdict for gross sexual imposition was unsupported by sufficient evidence and was therefore a violation of Due Process as guaranteed by the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.**

### Second Assignment of Error

**The verdict for rape was unsupported by sufficient evidence and was therefore a violation of Due Process as guaranteed by the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution; the conviction is also against the manifest weight of the evidence.**

### Third Assignment of Error

**The trial court erred to appellant's prejudice by allowing evidence of other acts in violation of Evid.R 404, causing appellant's trial to violate Due Process.**

### Fourth Assignment of Error

**Defense counsel rendered ineffective assistance in violation of the 6th Amendment to the U.S. Constitution and Section 10, Section 16, Article I of the Ohio Constitution.**

### Fifth Assignment of Error

**The trial court erred when it allowed the State to offer rebuttal testimony after the defense's case.**

## III.    DISCUSSION

{¶8} We address Clapsaddle's five assignments of error in an order that best facilitates our analysis.

### A. First Assignment of Error

{¶9} In the first assignment of error, Clapsaddle claims the GSI verdict was unsupported by sufficient evidence. He argues the evidence was insufficient both because T.M. did not testify to the GSI and because there was no evidence of force.

### 1. Standard of Review

{¶10} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Dent*, 2020-Ohio-6670, ¶ 15. Thus, our review is de novo. *Id.* A sufficiency challenge disputes whether a party met its burden of production at trial. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Dent* at ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilty beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. Thus, "[i]n assessing the sufficiency of the evidence, we do not resolve evidentiary conflicts or assess the credibility of witnesses." *State v. Jackson*, 2023-Ohio-2193, ¶ 26 (3d Dist.); *see also Jenks* at 279.

## 2. Applicable Law

{¶11} Clapsaddle was convicted of committing GSI, in violation of R.C. 2907.05(A)(1). That portion of the GSI statute provides that "[n]o person shall have sexual contact with another . . . when . . . [t]he offender purposely compels the other person . . . to submit by force or threat of force." R.C. 2907.05(A)(1). "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the . . . genitals . . . [or] pubic region . . . for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "A victim need not prove physical resistance to the offender" for the offender to be found guilty of GSI. R.C. 2907.05(D). However, "the statute requires that some amount of force must be proven beyond that force inherent in the crime itself." *State v. Dye*, 82 Ohio St.3d 323, 327 (1998).

{¶12} This court has analyzed the "force or threat of force" element similarly for both GSI and rape, at least where the defendant is in a position of authority over the victim.[1] *State v. Moore*, 2025-Ohio-712, ¶ 20 (3d Dist.); *see also State v. Biggs*, 2022-Ohio-2481, ¶ 16 (5th Dist.) ("[t]he force element needed to prove the offense of gross sexual imposition is the same as it is for rape"). The Supreme Court of

---

[1] While both use the same relevant phrase, "purposely compels the other person to submit by force or threat of force," rape involves "sexual conduct" instead of "sexual contact." R.C. 2907.02(A)(2).

Ohio has analyzed the "force or threat of force" element in the context of rape. It explained that "[a] defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51 (1992), paragraph one of the syllabus. "A threat of force can be inferred from the circumstances surrounding sexual conduct." *Id.* Additionally, "[t]he force . . . necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56 (1988), paragraph one of the syllabus; *see also State v. Burke*, 2020-Ohio-4781, ¶ 12, 14 (3d Dist.) (in a case involving GSI, explaining that the type and amount of force necessary to purposely compel a victim to submit by force or threat of force depends upon the victim and offender's relationship).

### 3. Analysis

{¶13} First, we address Clapsaddle's argument that there was insufficient evidence because T.M. did not testify to the act of GSI during the trial. More specifically, Clapsaddle stresses that T.M. did not testify at trial that he put his hands down her pants and touched her vagina.

{¶14} T.M. testified during cross-examination that she did not recall whether she had told lead investigator, Detective Dan Kemmere ("Detective Kemmere"), that Clapsaddle placed his hands down the front of her sweatpants and on her vagina. (Trial Tr. at 475-476). T.M. later explained that, although at trial she did not

specifically remember whether or not Clapsaddle put his hands down her pants and touched her vagina, it would not surprise her if she had previously reported to Detective Kemmere that this actually happened because she had "spent the last five years trying not to remember every single detail." (*Id.* at 508-509). Contrary to Clapsaddle's claim that T.M. "denied" the touching, she actually testified that she could not say that the vaginal touching did not happen.

{¶15} Importantly, during the State's case, Detective Kemmere testified about statements T.M. made during his initial conversation with her when she "laid out her recollection of the events." (*Id.* at 602). During his recitation of T.M.'s recollection, Detective Kemmere testified that T.M. said, while she and Clapsaddle were in his bedroom, Clapsaddle "grabbed at her or kissed at her and had put his, either hands or hand, down the front of her pants." (*Id.* at 606). Additionally, an audio recording of Detective Kemmere's initial conversation with T.M. was played for the jury. In the recording, Detective Kemmere asked T.M. where exactly Clapsaddle was touching, and she responded her vagina, inside of her pants and making skin-to-skin contact.[2] Accordingly, the State argues there was evidence at trial regarding Clapsaddle touching T.M.'s pubic region. Although Clapsaddle

---

[2] The recording was played during the Defense's cross-examination of Detective Kemmere to attack the quality of his investigation and to discredit T.M. Also during cross-examination, Detective Kemmere confirmed he had prepared an affidavit for a search warrant that included the statement, "[T.M.] stated [Clapsaddle] placed one of his hands down the front of her sweatpants, under her underwear, and was touching her vagina." (Trial Tr. at 752-753, 763). Defense counsel was then able to get Detective Kemmere to admit T.M. did not testify during trial that Clapsaddle placed his hand(s) down her pants, under her underwear, and touched her vagina. Although the audio recording was played for the jury, it was not introduced into evidence.

focuses on T.M.'s trial testimony and her credibility, the test for legal sufficiency is whether the evidence, *if believed*, supports the conviction.

**{¶16}** In his reply brief, Clapsaddle argues this testimony from Detective Kemmere was hearsay that does not fit any exception. We note that both the State and the Defense utilized this testimony, albeit for different purposes. Nonetheless, "[w]hen considering a challenge to the legal sufficiency of the evidence, . . . we must consider all of the evidence presented at trial, regardless of whether it was admitted erroneously." *State v. Moore*, 2019-Ohio-1671, ¶ 58 (2d Dist.); *see also State v. Brewer*, 2009-Ohio-593, ¶ 19-25 (explaining why a reviewing court deciding a sufficiency-of-the-evidence question considers *all* evidence presented at trial, including evidence that was erroneously admitted). In other words, an appellate court considers the same evidence that a trial court would have considered in deciding a motion for judgment of acquittal, i.e., all of the admitted evidence. *See Lockhart v. Nelson*, 488 U.S. 33, 41-42 (1988); Crim.R. 29; *State v. Mobley*, 2016-Ohio-4579, ¶ 39 (2d Dist.) (even if the officer's testimony was improperly admitted, "the Supreme Court of Ohio has rejected the position that a reviewing court should consider only properly admitted evidence to determine whether the State has presented sufficient evidence to support a conviction"). Therefore, we reject Clapsaddle's argument that there was insufficient evidence of GSI solely because T.M. did not specifically testify to the act of sexual contact during trial.

{¶17} Next, Clapsaddle challenges the "force or threat of force" element for GSI, so we focus solely on whether there was sufficient evidence to prove that particular element. *See Burke*, 2020-Ohio-4781, at ¶ 17 (3d Dist.). T.M. testified she was physically much smaller than Clapsaddle—a grown man who not only was a football coach but also T.M.'s teacher and for whom T.M. had been serving as a student aide. *Eskridge*, 38 Ohio St.3d 56 at paragraph one of the syllabus (the necessary force depends on the age, size, and strength of the parties and their relation to each other). He was an authority figure to T.M. *See State v. Simpson*, 2007-Ohio-7018, ¶ 37 (10th Dist.) ("[t]here is an obvious power disparity between authority figures, such as teachers and coaches, and the high school students under their charge"). Additionally, at the time of the offenses, T.M. was a minor. *Compare Schaim*, 65 Ohio St.3d at 55 (explaining that the rationale in *Eskridge* concerning the amount of force necessary to commit forcible rape in the circumstances presented did not apply because the victim in *Schaim* was over the age of majority).

{¶18} T.M. testified that, after Clapsaddle touched her on the arm and back, she told him she had to go and turned to leave the room, but Clapsaddle shut the door and placed his hand on the doorknob. T.M. testified that she knew she could not get out, even though she wanted to leave. Significantly, testimony from Detective Kemmere included that T.M. told him Clapsaddle "grabbed at her or

kissed at her" before putting his hand(s) down the front of her pants and touching her vagina. (*See* Trial Tr. at 602, 606, 752-753, 763).

**{¶19}** When viewed in a light most favorable to the prosecution, the evidence presented would allow a rational trier of fact to find the "force or threat of force" element beyond a reasonable doubt. *See Burke*, 2020-Ohio-4781, at ¶ 18-20, 22 (3d Dist.) (sufficient evidence of force or threat of force for GSI by high school coach who touched freshman victim's thigh while he pulled down on her athletic shorts, exposing her underwear). Under the standard of review, there was sufficient evidence that Clapsaddle used physical force against T.M. or created the belief that physical force would be used if she did not submit, based on the circumstances surrounding the sexual contact and the age, size, strength, and relationship between the parties. *Id.*; *Schaim*, 65 Ohio St.3d 51 at paragraph one of the syllabus; *Eskridge*, 38 Ohio St.3d 56 at paragraph one of the syllabus. As mentioned above, in resolving this assignment of error, we do not resolve evidentiary conflicts or assess the credibility of witnesses. *Jackson*, 2023-Ohio-2193, at ¶ 26 (3d Dist.). We reject Clapsaddle's arguments that the evidence of GSI was insufficient.[3]

**{¶20}** Clapsaddle's first assignment of error is overruled.

---

[3] Notably, unlike the rape verdict at issue in the second assignment of error, Clapsaddle does *not* claim the GSI verdict was against the manifest weight of the evidence.

## B.   Third Assignment of Error

**{¶21}** In the third assignment of error, Clapsaddle argues the trial court erred in allowing other-acts evidence to be introduced by the State, in violation of Evid.R. 404, rape-shield law pursuant to R.C. 2907.02(D), and his due process rights. Clapsaddle concedes his trial counsel failed to object to any of this evidence and, therefore, we review this assignment of error only for plain error.[4] *See also State v. Echols*, 2024-Ohio-5088, ¶ 28 (where the appellant did not object to admission of evidence allegedly prohibited by Evid.R. 404, an appellate court can reverse based on its admission only if the appellate court finds plain error).

### 1.   Standard of Review

**{¶22}** To establish plain error, an appellant must demonstrate (1) an error, i.e., a deviation from a legal rule occurred; (2) the error is plain, i.e., it must be an obvious defect in the proceeding; and (3) the error affected substantial rights, i.e., the trial court's error affected the outcome of the proceeding. *State v. Morgan*, 2017-Ohio-7565, ¶ 2, 36-37, 52. The Supreme Court of Ohio has admonished courts that "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Thus, even when an appellant has met his or her burden of demonstrating all three

---

[4] Defense counsel's failures to object to the evidence is the subject of the fourth assignment of error.

requirements, "a court still has discretion whether or not to correct the error." *State v. Lynn*, 2011-Ohio-2722, ¶ 14.

### 2. Applicable Law

{¶23} "Evid.R. 404(B) does not contain a blanket prohibition on the introduction of other-acts evidence." *Echols*, 2024-Ohio-5088, at ¶ 30. Instead, it "broadly prohibits the use of '[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.'" *Id.* at ¶ 24, quoting Evid.R. 404(B)(1). The rule goes on to reference permitted uses of other crimes, wrongs, or acts: "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). "Though Evid.R. 404(B) lists specific examples of permissible nonpropensity purposes for which other-acts evidence may be admitted, its list is not exhaustive." *Echols*, 2024-Ohio-5088, at ¶ 31. "The key [to admissibility] is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 2020-Ohio-4440, ¶ 22 ("evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue").

{¶24} In considering other-acts evidence, "trial courts should conduct a three-step analysis." *State v. Williams*, 2012-Ohio-5695, ¶ 19. "The first step is to consider whether the other acts evidence is relevant to making any fact that is of

consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20, citing Evid.R. 401. "[I]t is not enough to say that the evidence is relevant to a nonpropensity purpose." *Hartman* at ¶ 27. "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.*

{¶25} The second step "is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Williams* at ¶ 20. "[C]ourts must scrutinize the proponent's logic to determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences." *Hartman* at ¶ 23.

{¶26} "The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Williams* at ¶ 20, citing Evid.R 403. Given that the evidence rules do not bar all prejudicial evidence but only that which is unfairly prejudicial, "the primary concern is that the evidence creates an undue tendency to lead the factfinder to find guilt based on an impermissible character-based inference." *Echols*, 2024-Ohio-5088, at ¶ 41. Such evidence must be excluded when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Hartman*, 2020-Ohio-4440, at ¶ 29, citing Evid.R. 403(A).

**{¶27}** Clapsaddle also relies on the rape-shield law to support his argument that the trial court erred in allowing the testimony. Under the law,

> . . . Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, the defendant's past sexual activity with the victim, or is admissible against the defendant under [R.C. 2945.59], and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

R.C. 2907.02(D).

### 3. Analysis

**{¶28}** Clapsaddle identifies three portions of testimony when the State introduced other-acts evidence that he alleges resulted in the trial court committing plain error. We address each in turn.

### a. School counselor's testimony

**{¶29}** First, during school counselor Kohl's testimony about T.M. initially reporting the incident more than three years after it happened, the State asked Kohl whether T.M. said anything about why she was contacting Kohl at that time. The testimony at issue is Kohl's response: "[T.M.] said she was reaching out now because she had heard that it was happening to other students and she did not want it to happen to anyone else." (Trial Tr. at 243-244).

**{¶30}** We do not find any error in allowing this testimony, let alone plain error. Looking at the first step in the analysis, the testimony was relevant. It helped

-16-

explain the reason for T.M.'s delay in reporting the incident and her motivation for reporting—both of which the Defense attacked from the time of opening statements. *See State v. Harris*, 2023-Ohio-3994, ¶ 98-99 (10th Dist.) (the testimony at issue was relevant to explaining the victim's delay in reporting, where "part of the defense's trial strategy was to undermine the veracity of [the victim's] allegations by emphasizing her delay in reporting the incident"); *State v. Cioffi*, 2025-Ohio-423, ¶ 27 (3d Dist.) (where defendant attacked the victim's delay in reporting the alleged incidents, victim's testimony concerning past abuse and control was relevant). Thus, the purpose for Kohl's testimony went "to a 'material' issue that is actually in dispute between the parties." *Hartman*, 2020-Ohio-4440, at ¶ 27.

{¶31} Next, the testimony was presented for the legitimate purpose of countering the defense concerning T.M.'s delayed reporting, not to prove Clapsaddle's "character in order to show that on a particular occasion [Clapsaddle] acted in accordance with the character." Evid.R. 404(B)(1)); *see also State v. Hodson*, 2019-Ohio-1734, ¶ 42 (10th Dist.) (the other-acts testimony at issue "was admissible to help explain the delay in reporting the sexual assault allegations," so the trial court did not abuse its discretion in allowing it); *Cioffi* at ¶ 29 (where Defense strategy was to suggest victim had fabricated incidents because she delayed reporting them, other-acts testimony was permissibly used for the jury to understand victim's actions and as foundation for expert opinion); *Moore*, 2025-Ohio-712, at ¶ 71-73 (3d Dist.). In other words, the testimony was "probative of a separate,

-17-

nonpropensity-based issue," not elicited to prove Clapsaddle's disposition to commit a sex crime. *Hartman*, 2020-Ohio-4440, at ¶ 22.

**{¶32}** Finally, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The testimony "was probative in attempting to counter some of [Clapsaddle's] defenses" on issues in dispute and material to the case. *Cioffi* at ¶ 30. Additionally, the danger of unfair prejudice was reduced by the testimony's vagueness. In looking at the context surrounding the testimony at issue, it is not clear what T.M. was referring to when she stated she did not want "it" to happen to anyone else. The reference could have referred to Clapsaddle engaging in sexual activity with other students or, for example, to *any* teacher engaging in inappropriate communications with other students or even students again having to deal with *rumors* of sexual activity. In fact, the testimony and other evidence up to that point in the trial had not involved anything of a sexual nature, but instead simply focused on how it was inappropriate for teachers to communicate privately with students outside of school and a rumor that Clapsaddle and T.M. had been communicating through Snapchat. *See Echols*, 2024-Ohio-5088, at ¶ 42 (the Evid.R. 403(A) balancing test requires the court to engage in a "highly fact-specific and context-driven analysis"); *State v. O.E.P.-T.*, 2023-Ohio-2035, ¶ 156-157 (10th Dist.) (non-descriptive, vague references to prior domestic violence incidents constituted other-acts evidence, but were not unfairly prejudicial and any objection to such testimony would have been futile). Therefore, the testimony

passed the three-step analysis for admissibility. *Moore*, 2025-Ohio-712, at ¶ 74 (3d Dist.).

{¶33} Clapsaddle relies on *State v. Diaz*, 2024-Ohio-3427 (6th Dist.) in support of his argument. However, in our view, *Diaz* actually helps the State fulfill the first two steps of the analysis and is distinguishable on the third step. In *Diaz*, the victim's testimony that she reported the alleged rape only after she saw defendant's name on a sex offender registry was relevant and offered for the non-character-based purpose of proving her motivation to report and to explain her delay in reporting. *Id.* at ¶ 1, 29-30. However, the appellate court found the danger of unfair prejudice by informing the jury that Diaz was on a sex offender registry substantially outweighed the probative value of the testimony. *Id.* at ¶ 31-38. In contrast to the instant case, the defendant in *Diaz* had objected to the introduction of the testimony both prior to and during trial, the defendant purposely had not made the delay or motivation in reporting an issue in the case, and the testimony at issue clearly showed the existence of a prior, sex-related offense committed by the defendant. *See id.* at ¶ 5-8, 14, 33-34. The *Diaz* court noted the defendant "had not made that delay an issue in the case" during the trial and "did not pursue any consideration of [the victim's] delay in reporting in his opening statement to the jury," although, "[h]ad he done so, he arguably could have opened the door for the State to provide an explanation." *Id.* at ¶ 34-35. Therefore, the appellate court in *Diaz* found the trial court abused its discretion by allowing the testimony over

defendant's objection. *Id.* at ¶ 43. Here, we do not find the trial court committed plain error.

#### b. Detective Kemmere's testimony

**{¶34}** The second portion of testimony at issue was from Detective Kemmere. During cross-examination, defense counsel elicited from Detective Kemmere that he had investigated rumors involving Clapsaddle having an inappropriate relationship with two other students. Defense counsel further elicited that Detective Kemmere's investigation dispelled those rumors as unfounded, Clapsaddle did not face any legal charges involving them, and Detective Kemmere was unaware of whether Clapsaddle was facing any disciplinary action concerning them. The alleged offensive testimony at issue comes from Detective Kemmere's subsequent testimony on re-direct examination. The State asked a few follow-up questions about his investigation of those rumors, namely who the two other students were, who he spoke with during that investigation, and what he found out during that investigation.

**{¶35}** "[T]estimony about prior acts elicited by the State will not be found to constitute prejudicial error where the Defense first 'opens the door' to such questioning." *State v. Morris*, 2023-Ohio-4021, ¶ 27 (3d Dist.), quoting *State v. Brooks*, 2008-Ohio-3723, ¶ 53 (9th Dist.). In other words, by being the first to broach a topic, a defendant may enable the State to engage in questioning on matters the State would not have otherwise been able to address. *Id.* Consequently, "[i]f

the Defense introduces other acts testimony on cross-examination, an objection to the State's subsequent questioning on this matter is generally waived even if such evidence would have been otherwise inadmissible." *Id.*; *see also State v. Waver*, 1999 WL 632902, *2, 8 (8th Dist. Aug. 19, 1999) (defense counsel's questioning of victim about her past violent relationship with the defendant opened the door to allow the State to question the victim about defendant's prior acts of hitting and beating her and the victim obtaining a restraining order). The same is true with respect to what typically may be inadmissible testimony due to rape-shield protection. *E.g.*, *State v. Banks*, 71 Ohio App.3d 214, 219-220 (3d Dist. 1991) ("when the defendant 'opened the door' to the issue of his past sexual conduct, he effectively waived the statutory limitations regarding specific instances of sexual activity"; rejecting defendant's contention that the testimony at issue violated rape-shield law).

{¶36} Here, the Defense's cross-examination opened the door to the testimony at issue during re-direct examination. The record indicates the Defense elicited the testimony about the investigations of rumors concerning Clapsaddle in an attempt to discredit T.M. by showing that the other rumors Detective Kemmere investigated were found to be false. In making that strategic decision, the Defense enabled the State to follow up with limited questions that clarified certain aspects of Detective Kemmere's answers related to those investigations. *Morris* at ¶ 36 (where defense counsel inquired into the witness' involvement in trafficking drugs

in defendant's hotel room, the Defense opened the door to subsequent questioning about the witness' involvement in those activities). We do not find any error in allowing this testimony, let alone plain error. *Id.*; *Brooks* at ¶ 52-53 (defense counsel opened the door to testimony about defendant's prior convictions on cross-examination when counsel "attempted to bolster her defense that she was being unfairly targeted because the investigators held a grudge").

### c. Testimony during cross-examination of two Defense witnesses

{¶37} The third portion of testimony at issue is from the State's cross-examination of two of Clapsaddle's character witnesses. Jason Jones ("Jones") was the assistant principal at the high school at the time of the incident. During the Defense's direct examination, Jones discussed one of Clapsaddle's teacher evaluations. The Defense asked Jones about the result of his evaluation of Clapsaddle, and Jones testified that Clapsaddle "developed a great classroom culture," "[i]t was evident he had developed great rapport with the students," and he received "an overall rating of skilled teacher." (Trial Tr. at 1011-1012). Also, Jones testified he told Clapsaddle he could be used by Clapsaddle as a job reference, even after becoming aware of the allegations by T.M.

{¶38} During cross-examination, the State asked Jones if he ever had to discipline Clapsaddle. Jones responded that he wrote a letter about a situation that happened around the summer of 2021 involving one of the two students involved in

the rumors that Detective Kemmere had investigated (thus, not T.M.). The State reviewed the letter with Jones, who admitted the letter was actually a "written reprimand." (*Id.* at 1024). The letter indicated the school had received a report that Clapsaddle "may have engaged in unprofessional conduct this summer with an 18-year-old student who recently graduated from" the high school. (*Id.* at 1021). The letter further stated that, "[w]hen interviewed, [Clapsaddle] admitted receiving a Snapchat call from the student, driving to an address at her request, because she allegedly was in distress, letting the student get into [his] car and talking with her alone in [his] vehicle." (*Id.* at 1021-1022). It went on to say, "Based on your admitted behavior, you failed to use common sense and good professional judgment with this incident," and it quoted from a licensure code and a code of conduct. (*Id.* at 1022-1023). The letter did not indicate Clapsaddle engaged in any kind of romantic or sexual encounter with the student.

{¶39} Additionally, during the Defense's examination of Colby Rush ("Rush"), another teacher at the high school, the Defense asked Rush about rumors at the school, his observations of student interactions with Clapsaddle, his thoughts about Clapsaddle as a teacher, and whether Clapsaddle had ever sought advice from him. Rush testified there was an "enormous amount" of rumors, including some about himself; Clapsaddle had good relationships with students; "students were drawn to [Clapsaddle] in a positive way"; he thought Clapsaddle was a "great" teacher; the school prioritized and encouraged teachers to build relationships with

the students; and Clapsaddle had sought out advice from him about communicating with a student about her home life and bullying. (*Id.* at 1031-1040). Regarding Rush's discussions with Clapsaddle about that student, Rush testified that Clapsaddle expressed concerns about communicating via phone with the student because she was female, he was concerned about the student, and he was afraid that she might lash out at him in some way if he broke her trust.

{¶40} During Rush's subsequent cross-examination, the State asked him, "Would it surprise you that Mr. Clapsaddle admitted to an inappropriate relationship with a student that was done being a student in less than a year, in violation of the licensure code?" (*Id.* at 1049). Rush indicated it would surprise him.

{¶41} As an initial matter, the testimony at issue does not indicate it was evidence of defendant's sexual activity. Thus, the rape-shield law does not apply. Regarding Evid.R. 404, once again, the Defense opened the door to the testimony at issue. It put Clapsaddle's character at issue by attempting to show he was a great teacher who followed school directives, interacted well and built good relationships with students in accordance with the school's priorities, and was someone who was concerned about and tried to help students. Thus, Clapsaddle offered evidence of a pertinent character trait, and the State was then permitted to rebut that evidence. Evid.R. 404(A)(1); *State v. Garcia*, 2016-Ohio-585, ¶ 69 (8th Dist.) ("[b]y eliciting testimony from a witness vouching for the defendant's peaceful character, the defense 'opened the door' for the prosecution, which was then permitted to rebut

that testimony"); *State v. Waller*, 2023-Ohio-493, ¶ 6, 14 (3d Dist.). The trial court did not commit plain error in permitting the State to elicit the testimony at issue.

{¶42} Clapsaddle also asserts that the trial court failed to give a limiting jury instruction about the testimony at issue and the failure to do so is reversible error. In addition to not objecting to the testimony itself, Clapsaddle's counsel did not "request a limiting instruction during trial or before the case was submitted to the jury and did not object to the final jury instructions." *Echols*, 2024-Ohio-5088, at ¶ 50. Therefore, Clapsaddle must show plain error for this issue too. Considering the Defense strategy at trial, we are not convinced the trial court erred in failing to provide an instruction that was not requested, plus Clapsaddle failed to show the outcome of the trial clearly would have been different if the trial court gave a limiting instruction regarding the particular evidence at issue. *Id.* at ¶ 51-52.

{¶43} Clapsaddle's third assignment of error is overruled.

### C.   Fourth Assignment of Error

{¶44} Closely related to the third assignment of error, Clapsaddle in the fourth assignment of error argues his trial counsel rendered ineffective assistance by raising the rumors involving other students and failing to object to the other-acts evidence addressed in the third assignment of error.

#### 1.   Applicable Law

{¶45} To establish ineffective assistance of counsel, the appellant "must show (1) deficient performance by counsel, i.e., performance falling below an

objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Tench*, 2018-Ohio-5205, ¶ 264. "Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying this two-pronged test, and the failure to make either showing is fatal to the claim." *State v. Radabaugh*, 2024-Ohio-5640, ¶ 51 (3d Dist.), citing *State v. Conway*, 2006-Ohio-791, ¶ 165, 168.

**{¶46}** Regarding the first requirement, "[i]n order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment." *State v. Houston*, 2010-Ohio-6070, ¶ 35 (3d Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Judicial scrutiny of counsel's performance should be highly deferential and should refrain from second-guessing strategic decisions of trial counsel. *State v. Sallie*, 81 Ohio St.3d 673, 674 (1998). "Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance." *Houston* at ¶ 36, citing *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). "Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client." *Id*.

**{¶47}** Regarding the second requirement, "[p]rejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different.'" *Houston* at ¶ 36, quoting *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Bradley* at 142.

### 2.     Analysis

{¶48} Clapsaddle has not established the first requirement for his claim of ineffective assistance of counsel, i.e., he has not shown deficient performance by his trial counsel. Instead, the other-acts evidence and lack of objections at issue arose from counsel's actions that constituted trial strategies prompted by reasonable professional judgment. After a full review of the trial transcript, we note defense counsel faced many strategic decisions that were double-edged-swords because they involved the potential for both positive and negative consequences.

{¶49} As shown above, Kohl's testimony about T.M. disclosing when she did because of rumors involving other students was admissible. Accordingly, objecting would have been futile. "Defense counsel's failure to object to admissible evidence does not constitute deficient performance under *Strickland*." (Emphasis deleted.) *O.E.P.-T.*, 2023-Ohio-2035, at ¶ 156-157 (10th Dist.); *see also State v. Issa*, 93 Ohio St.3d 49, 68 (2001) ("[c]ounsel is certainly not deficient for failing to raise a meritless issue"). Moreover, not objecting may have been a reasonable trial strategy so as not to bring a heightened awareness to Kohl's ambiguous testimony concerning why T.M. first reported the incident after more than three years had passed. *Harris*, 2023-Ohio-3994, at ¶ 98, 100-103 (10th Dist.) (counsel's failure to

object to a brief, vague reference to "previous times" the defendant said he was going to kill the victim was not deficient performance); *see also State v. Johnson*, 2006-Ohio-6404, ¶ 140 (experienced trial counsel know that objections to each potentially objectionable statement from a witness could actually act to their party's detriment).

**{¶50}** Next, in reviewing Detective Kemmere's testimony regarding his investigation into rumors about Clapsaddle having an inappropriate relationship with two other students, we again are reminded to refrain from second-guessing counsel's reasonable strategic decisions. *Sallie*, 81 Ohio St.3d at 674; *see also State v. Grant*, 2023-Ohio-2720, ¶ 55 (3d Dist.) (debatable trial tactics do not establish ineffective assistance of counsel). According to T.M.'s description of the incident, she was the only person present besides Clapsaddle, and she waited more than three years before reporting it. Consequently, the Defense employed a viable strategy to attack T.M.'s credibility. One way it attacked her credibility was highlighting that T.M. denied all rumors about Clapsaddle having an inappropriate relationship with her up until she reported it to Kohl years later.[5] Another way it attempted to attack T.M.'s credibility was showing that Detective Kemmere investigated the rumors involving the two other students—one of whom was brought to his attention by T.M. as someone who had endured a similar incident with Clapsaddle. Although

---

[5] However, T.M. testified she did tell three close friends about the incident, two of whom testified at trial and confirmed T.M. had told them about the incident prior to T.M. disclosing it to Kohl in 2022.

his testimony brought out the fact there were other allegations against Clapsaddle, his investigation dispelled the rumors about the two other students as unfounded and discredited T.M., who was the source of one of the rumors. In short, there was logic to the strategy of bringing up the other rumors, even though it opened the door for the State to ask further questions—the responses to which arguably hindered Clapsaddle's defense. *State v. O'Neil*, 2024-Ohio-512, ¶ 74-75, 82 (11th Dist.) (defense counsel's attempt to create doubt as to whether defendant caused the injuries, which consequently opened door for the State to elicit damaging testimony, was a matter of trial strategy and not ineffective assistance of counsel); *State v. Rizer*, 2011-Ohio-5702, ¶ 5, 33 (4th Dist.) (counsel did not render ineffective assistance by not objecting to testimony after he opened the door to such testimony while executing a reasonable trial strategy).

**{¶51}** Calling character witnesses to testify was also a valid defense strategy. In what was primarily a he-said-she-said trial of credibility, in addition to attacking T.M.'s credibility, the Defense attempted to boost Clapsaddle's credibility through testimony by his superior and his peer about being a great teacher and mentor to students. Although this strategy also allowed the State to introduce potentially harmful evidence, it fell within the scope of reasonable trial strategy. *See State v. Summerour*, 2003-Ohio-6783, ¶ 10-12 (12th Dist.) (rejecting argument that defense counsel was ineffective for 'opening the door' to questions and argument regarding defendant's pre-arrest silence); *State v. Demoss*, 2002 WL 360581, *8 (2d Dist. Mar.

8, 2002) (defense counsel's decision to have witness corroborate some of defendant's unsupported testimony, even though it opened the door to impeaching that witness with her grand jury testimony, "was a matter of trial strategy upon which reasonable professional opinions may differ").

{¶52} Clapsaddle's fourth assignment of error is overruled.

### D. Fifth Assignment of Error

{¶53} In the fifth assignment of error, Clapsaddle argues the trial court erred by allowing the State to offer rebuttal testimony after the Defense rested its case.

#### 1. Standard of Review

{¶54} Appellate courts review a trial court's decision to allow rebuttal testimony for an abuse of discretion. *See State v. Depinet*, 2013-Ohio-1850, ¶ 13-14, 20 (3d Dist.); *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 409 (1994). A trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9.

#### 2. Applicable Law

{¶55} "Rebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence." *State v. McNeill*, 83 Ohio St.3d 438, 446 (1998). A party has an unconditional right to present rebuttal testimony on matters first addressed in an opponent's case-in-chief that the rebutting party did not need to properly present in

its own case-in-chief. *State v. Lee*, 1999 WL 824611, \*2 (3d Dist. Oct. 8, 1999), citing *Phung* at 410; *see also* R.C. 2315.01(A)(4). If a party bears the burden of proving a certain matter, then the matter is properly presented in that party's case-in-chief. *Phung* at 410.

### 3. Analysis

{¶56} After the Defense rested its case-in-chief, the State indicated it anticipated presenting rebuttal testimony. Clapsaddle's trial counsel asserted the Defense presented "nothing new" during its case-in-chief, so he objected to allowing any rebuttal testimony. Over Clapsaddle's objection, the trial court allowed rebuttal testimony by T.M. "within the narrow limits of rebuttal," with "[n]o new evidence or attempts to get in new evidence." (Trial Tr. at 1254). T.M.'s rebuttal testimony was relatively brief, including the State only asking a handful of questions before turning the witness over to the Defense for cross-examination. (*Id.* at 1265-1268).

{¶57} The trial court did not abuse its discretion in allowing rebuttal testimony from T.M. because there were matters first addressed in the Defense's case-in-chief that the State did not need to present in its case-in-chief. *Phung*, 71 Ohio St.3d at 410. For example, in an apparent attempt to explain why Clapsaddle had been communicating with T.M. outside of school yet lied to the principal about it, Clapsaddle testified during the Defense's case that he had concerns about T.M.'s wellbeing. He explained she was dealing with a difficult relationship with her

mother, a break-up with her boyfriend, and rumors. Clapsaddle testified he was afraid T.M. might "hurt herself"—referencing that he heard stories of kids who were bullied doing something drastic, "like a suicide attempt." (*See* Trial Tr. at 1075-1079). In response to Clapsaddle's claims, the majority of the State's questions to T.M. on rebuttal concerned whether she had been suicidal and whether she had ever told Clapsaddle she was suicidal. Thus, the State was attempting to refute Clapsaddle's testimony on new facts he introduced. The trial court's decision to allow rebuttal testimony was not an abuse of discretion. *State v. Benson*, 2007-Ohio-830, ¶ 131-133 (8th Dist.) (trial court did not abuse its discretion in allowing rebuttal testimony to counter defendant's testimony about where he was during the murder and whether he had solicited anyone to testify falsely in support of that alibi); *see also State v. Mendoza*, 2017-Ohio-8977, ¶ 60, 68 (10th Dist.).

{**¶58**} Clapsaddle's fifth assignment of error is overruled.

### E.     Second Assignment of Error

{**¶59**} In the second assignment of error, Clapsaddle asserts the guilty verdict for rape was both unsupported by sufficient evidence and against the manifest weight of the evidence.

#### 1.     Standard of Review

{**¶60**} The standard of review for sufficiency of the evidence is set forth above. In contrast to that standard, the "manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *State v. Messenger*, 2022-

-32-

Ohio-4562, ¶ 26. "[W]e review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting" evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Yet, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119. To reverse a judgment from a jury trial on the weight of the evidence, all three appellate judges must concur. Ohio Const., art. IV, § 3(B)(3).

### 2. Applicable Law

{¶61} Clapsaddle was convicted of rape in violation of R.C. 2907.02(A)(2), which provided, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The term "sexual conduct" included "vaginal intercourse between a male and female" as well as "the insertion, however slight, of any part of the body" into the vaginal opening of another. R.C. 2907.01(A). We previously set forth applicable

-33-

law concerning the "purposely compels another to submit to sexual conduct by force or threat of force" element in our analysis of the first assignment of error, above.[6]

### 3. Analysis

{¶62} In support of this assignment of error, Clapsaddle relies on sixteen alleged inconsistencies in T.M.'s testimony leading to her "pervasive credibility issues." However, as set forth above, "[i]n assessing the sufficiency of the evidence, we do not resolve evidentiary conflicts or assess the credibility of witnesses." *Jackson*, 2023-Ohio-2193, at ¶ 26 (3d Dist.); *see also Jenks*, 61 Ohio St.3d at 279. Therefore, we reject Clapsaddle's sufficiency-of-the-evidence challenge concerning the rape verdict.

{¶63} Turning to the manifest-weight-of-the-evidence challenge, having reviewed the entire record and weighed the evidence and all reasonable inferences, it is our determination that the jury did not lose its way and create a manifest miscarriage of justice in resolving conflicts in the evidence. *Wilks*, 2018-Ohio-1562, at ¶ 168. The evidence does not weigh heavily against the rape conviction. *Hunter*, 2011-Ohio-6524, at ¶ 119.

{¶64} In examining what Clapsaddle labels as "multiple inconsistencies in T.M.'s testimony and T.M.'s pervasive credibility issues," we find most of the instances of which Clapsaddle complains were relatively minor. For instance,

---

[6] We note that Clapsaddle's position has always been that the incident never occurred and he never engaged in sexual conduct with T.M. Thus, the issue presented does not involve a defense that the victim consented.

whether Clapsaddle led T.M. to his bedroom by the arm or she just followed him there is not sufficient to negatively impinge her credibility. Others are not supported by the record. For example, Clapsaddle highlights T.M.'s testimony that she walked into his house through the driveway side door. Clapsaddle claims this would have been impossible because that door was only able to be locked and unlocked from the inside and only the front door was used to enter and exit the home. However, Clapsaddle's roommate acknowledged that he and Clapsaddle would (infrequently) use that side door and it was not in a constant state of being locked. Furthermore, T.M. testified that Clapsaddle went into the house through that door and she simply "walked in the door that I saw him walk in." (Trial Tr. at 365-366).

{¶65} As another example, Clapsaddle points out that T.M. testified she walked through a mudroom, into the kitchen, and could see Clapsaddle sitting on the living room couch from the kitchen. Again, he claims this is impossible because there was a wall between the two rooms and "[i]t wasn't until after the renovations [to remove part of the wall] that someone could stand in the kitchen and easily see into the living room." (Appellant's Brief at 7). However, in his testimony, Clapsaddle acknowledged there was an open archway between the two rooms, and his roommate acknowledged that—although you could not see into the living room from the mudroom—you could see into the living room from parts of the kitchen even before the renovations. The roommate's testimony was consistent with T.M.'s testimony that she walked through the mudroom and into the kitchen, she believed

there was a full wall between the kitchen and living room, and she had to start walking through the kitchen before she was able to see Clapsaddle in the living room.

{¶66} Clapsaddle also claims T.M. misidentified where his bed was located in his bedroom. However, during trial, Clapsaddle's roommate drew a picture of the layout of Clapsaddle's room from the time when they lived together. (Exhibit 10; Trial Tr. at 284-285, 294). T.M.'s own drawing of the layout of Clapsaddle's room is nearly identical, including the bed being next to the door. (Exhibit 14). Although Clapsaddle's roommate testified that Clapsaddle had switched the layout of his room at one point, he did not know if the switch happened before or after the time of the alleged incident.

{¶67} Although we acknowledge that T.M. had some credibility issues, including inconsistencies in her statements to law enforcement and at trial, those issues do not rise to the level necessary for us to find that the jury clearly lost its way and created a manifest miscarriage of justice. *E.g.*, *State v. Chute*, 2022-Ohio-2722, ¶ 32 (3d Dist.) (rape verdict not against manifest weight of the evidence where it was evident the jury found victim's testimony to be credible despite perceived inconsistencies and notwithstanding her delayed disclosure); *State v. Pryor*, 2024-Ohio-3154, ¶ 42-44 (3d Dist.) (conviction was not against manifest weight of the evidence where defendant-appellant argued the victim was not credible and the jury erred by finding her version of events more credible than his). Furthermore,

Clapsaddle—who testified in his own defense, thus allowing the jury to assess his demeanor as well as that of T.M.—had credibility issues and inconsistencies in his statements to law enforcement and at trial too. For example, both T.M. and Clapsaddle admitted they lied to the school principal when asked if they were communicating outside of school.[7] T.M. explained that she lied because Clapsaddle had told her she would be in as much trouble as he would be if anyone found out about their relationship. She further testified that Clapsaddle made it very clear from the beginning not to let anyone know about their relationship. Detective Kemmere testified that T.M. said Clapsaddle advised her not to keep messages and to mostly communicate through phone calls so there would be no record of their communications. Yet, phone records confirmed that Clapsaddle called T.M. after they each had separately met with the principal. T.M. testified Clapsaddle called to remind her that they both would get in trouble if she admitted they had been communicating outside of school and he wanted to make sure she had not admitted to doing so.

{¶68} As a further example of Clapsaddle's own credibility issues, Clapsaddle told Detective Kemmere during his interview in October 2022 that T.M. had never been inside his house. However, at trial, he admitted she had been inside his house once. Arguably, this testimony was necessary to explain how T.M knew

---

[7] T.M. testified that Clapsaddle had told her what happened during the incident was love and they just had to keep it a secret until she turned 18 and then they could be together. She also testified that it was not until later that she truly understood what had happened to her was rape.

the layout of his bedroom furniture. Additionally, Clapsaddle indicated to Detective Kemmere during the interview that he and T.M. had only talked on the phone two or three times over the years and those calls were all initiated by her. However, at trial, the phone records obtained by Detective Kemmere showed more than 70 calls between them. In addition to the call Clapsaddle made to T.M. after they had separately met with the principal, one late night call Clapsaddle made to her was at 11:07 p.m. and lasted 81 minutes. Other examples of calls he made to T.M. were ones that lasted for 50 minutes, 25 minutes, and 42 minutes. Ultimately, Clapsaddle acknowledged at trial that he had participated in those more than 70 calls with T.M., highlighting that Clapsaddle had credibility issues too.

{¶69} Additionally, during his interview with Detective Kemmere, Clapsaddle never mentioned the "lengthy" Snapchat message he allegedly received from T.M. in response to which Clapsaddle claims he rejected her desires for a relationship with him. This is particularly notable given that Detective Kemmere started the interview by informing him that the case involved Clapsaddle allegedly having sex with T.M. after a basketball game, and even though Clapsaddle went through a list he had made of all his alleged contacts with T.M. over the years during that interview. There also was no record of the alleged "lengthy" Snapchat message shown at trial. A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's evidence rather than the defendant's version of events. *Pryor*, 2024-Ohio-3154, at ¶ 43 (3d Dist.).

{¶70} Clapsaddle's second assignment of error is overruled.

**IV.    CONCLUSION**

{¶71} For the foregoing reasons, Clapsaddle's assignments of error are overruled.  Having found no error prejudicial to the appellant in the particulars assigned and argued, we affirm the judgment of the Hardin County Court of Common Pleas.

*Judgment Affirmed*

**WALDICK, P.J. and WILLAMOWSKI, J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Mark C. Miller, Judge

_____
Juergen A. Waldick, Judge

_____
John R. Willamowski, Judge

DATED:
/jlm